SHORELINE TOWERS CONDO-
MINIUM OWNERS ASSOC.,
INC., Plaintiff,

v.

ZURICH AMERICAN INS.
CO., Defendant.

No. 01–775–BH–S.

United States District Court,
S.D. Alabama,
Southern Division.

March 25, 2002.

Gary V. Conchin, Harvey B. Morris, Morris, Conchin, Banks & Cooper, Huntsville, AL, Douglas L. Grose, Matthew R. Danahy, Tampa, FL, for plaintiff.

Helen Johnson Alford, Paul V. Lagarde, Alford, Clausen & McDonald, Mobile, AL, William Lanier Wallis, Butler, Burnette & Pappas, LLP, Tallahassee, FL, for defendant.

### ORDER

HAND, Senior District Judge.

This matter is before the Court on the Defendant's motion (Doc. 7) for summary judgment, filed February 5, 2002. By order (Doc. 10) dated February 6, 2002, the Court instructed the Plaintiff to respond within 30 days, showing cause why the Defendant's motion ought not be granted. Since the Plaintiff has failed to respond, and for the reasons that follow, the Defendant's motion for summary judgment is **due to be and is hereby GRANTED.**

### I. FINDINGS OF FACT [1]

1. Zurich American Insurance ("Zurich") issued a policy of property insurance to Resort Development, Inc., No. CPO–794–04–00–02 (the "Policy"). Resort Development, Inc. (hereinafter "RDI") was the named insured. The Policy covered approximately 40 resort properties owned,

---

**1.** The facts are undisputed, as the Plaintiff has not filed a response to the Defendant's motion for summary judgment. *See* Local Rule 7.2(b).

developed or managed by RDI. (*See* Policy, which is on file with the court).

2. The plaintiff, Shoreline Towers Condo Owners Association ("Shoreline"), was listed on the Policy's named insured endorsement. (*See* Policy at page 8).

3. The property known as Shoreline Towers, which is located at 1115 West Beach Boulevard, Gulf Shores, Alabama, was identified as an insured location under the Policy. (*See* Policy at page 12).

4. Hurricane Opal struck the panhandle area of Alabama and Florida on or about October 4, 1995 and caused damages to some of the condominium properties owned by RDI, to include the property known as Shoreline Towers. (*See* affidavit of Healy, paragraphs 4 and 5).

5. After Hurricane Opal occurred, Zurich received several claims from RDI regarding various properties damaged by the hurricane. These properties were located along the Gulf Coast of Florida and Alabama. RDI filed claims under the Policy for the following properties:

 a. Panama City Resort & Club, located in Panama City Beach, Florida;

 b. Ocean Towers Beach Club, located in Panama City Beach, Florida;

 c. Landmark Beach Resort, located in Panama City Beach, Florida; and

 d. Shoreline Towers, located in Gulf Shores, Alabama. (*See* affidavit of Healy, paragraph 5).

6. John J. Healy ("Healy") was the principal insurance adjustor for Zurich regarding the various claims of RDI arising out of Hurricane Opal in 1995. (*See* affidavit of Healy, paragraph 4).

7. In October 1996, RDI retained the Advantage Loss Group ("Advantage"), a public adjusting firm, as their representatives regarding RDI's insurance claims with Zurich. Advantage became involved in all the RDI insurance claims with Zurich, to include the claim for Shoreline Towers. (*See* affidavit of Healy, paragraph 8).

8. In handling the insurance claims presented by RDI, Healy dealt primarily with Mr. Greg Watson ("Watson") of Advantage and Mr. Timothy Fisher ("Fisher") of RDI. (*See* affidavit of Healy, paragraph 9).

9. RDI was the general management company for Shoreline. (*See* paragraph 8 of the complaint.)

10. A management agreement existed between RDI and Shoreline under which RDI was granted the authority to handle all insurance matters on behalf of Shoreline. Pursuant to this management agreement, RDI had the authority to place or keep in force all insurance, to act as agent for Shoreline, to adjust all claims arising under any insurance policies, to deliver releases upon payment of claims, to receive on behalf of Shoreline any insurance proceeds and to exercise all rights of the insured. (*See* exhibit I to Healy affidavit.)

11. After Hurricane Opal, Zurich investigated the damages to Shoreline Towers and determined that the amount of damages covered under the Policy were less than the $40,000 deductible which applied to Shoreline Towers. (*See* affidavit of Healy, paragraph 7).

12. RDI contacted Zurich in December 1996 and made a claim for additional damages to Shoreline Towers caused by Hurricane Opal. (*See* affidavit of Healy, paragraph 10).

13. Zurich investigated the additional claim made by RDI for damages to Shoreline Towers and subsequently determined that the amount of covered damages was $334,901. (*See* affidavit of Healy, paragraph 11).

14. Zurich applied the $40,000 deductible to the amount of covered damages and paid RDI a total of $294,901 for the dam-

ages to Shoreline Towers. (*See* affidavit of Healy, paragraph 11).

15. On September 11, 1997, Fisher of RDI executed a Sworn Statement in Proof of Loss ("Proof of Loss") and forwarded the Proof of Loss to Healy to request payment. The Proof of Loss reflects that the $40,000 deductible is applied against the $334,901 for a claimed amount of $294,901. (*See* affidavit of Healy, paragraph 11, and exhibit C to the affidavit).

16. Zurich issued two checks which totaled $294,901. One check was issued on 3/13/97 in the amount of $200,000 and the second check was issued on 9/16/97 in the amount of $94,901. Both checks were made payable to RDI, Advantage and Shoreline. (*See* affidavit Healy, paragraph 12).

17. After receiving the $294,901 payment, RDI claimed that there were additional amounts owed under the Policy for the damages to Shoreline Towers. Zurich disagreed with RDI's assertion that there were additional damages owed under the policy. (*See* affidavit of Healy, paragraph 13).

18. Watson of Advantage was involved on behalf of RDI regarding the claim for the additional damages to Shoreline Towers. (*See* affidavit of Healy, paragraph 13, and composite exhibit E to the affidavit).

19. RDI and Zurich's dispute over additional amounts owed under the Policy was eventually settled under an agreement whereby Zurich agreed to pay an additional $86, 000 in return for a Release of All Claims from RDI. (*See* affidavit of Healy, paragraph 14).

20. Pursuant to the settlement agreement, Zurich issued a check on 3/24/98 in the amount of $86,000 made payable to RDI, Advantage and Shoreline. The check was negotiated by the payees and paid by Zurich. The proceeds from the check were deposited in Shoreline's bank account. (*See* affidavit of Healy, paragraph 14).

21. All the checks issued by Zurich for damages to Shoreline Towers were negotiated by the payees, and paid by Zurich. (*See* affidavit of Healy, paragraph 11).

22. In return for the payment of $86,000, RDI executed a Release of All Claims ("Release"). (*See* affidavit of Healy, paragraph 15).

23. The Release states in pertinent part as follows:

### RELEASE OF ALL CLAIMS

RESORT DEVELOPMENT INTERNATIONAL, INC. (hereinafter "RDI") hereby makes the following representations of fact and gives this Release of All Claims against ZURICH INSURANCE COMPANY as set out below:

4. ZURICH has paid $294,901 to RDI for damages to the Shoreline Tower property at 1155 West Beach Blvd., Gulf Shores, Alabama. RDI claims additional benefits are due under the Policy for damages to the Shoreline Towers property. ZURICH disputes the additional amounts claimed by RDI are due under the terms of the Policy.

5. The parties have agreed upon the payment of an additional Eighty Six Thousand Dollars ($86,000.00) by ZURICH to RDI to bring RDI's claim as to the Shoreline Towers property to a full and final conclusion.

6. RDI acknowledges this is a disputed claim.

7. In return for this payment RDI, for itself and on behalf of its employees, agents, attorneys, and adjusters, hereby gives to ZURICH INSURANCE COMPANY, its employees, agents, attorneys, and adjusters this Release of All Claims arising out of damage to the Shoreline Tower property, including all contractu-

al claims, extra-contractual claims, tort claims, statutory claims, claims for interest, costs, expenses and attorney fees, and including all claims arising out of the claims adjustment and claims handling process.

8. RDI warrants that it has not assigned any portion of any claim regarding the Shoreline Tower property to any other person or entity and that it, RDI, is the sole holder and owner of any rights under the policy, or any rights otherwise related to the Shoreline Tower property, as they regard ZURICH INSURANCE COMPANY.

9. RDI has had opportunity to consult with its adjusters and attorneys, and has read and understands this Release. (*See* the Release, which is exhibit G to affidavit of Healy).

24. The Release was signed by Fisher, as Vice President of RDI, and his signature was notarized. (*See* affidavit of Healy, paragraph 15, and exhibit G to the affidavit).

25. At all times material to this action, Shoreline, RDI and Advantage had a copy of the Policy. (*See* affidavit of Harold Cochrane)

26. On or about September 14, 1999, Watson of Advantage sent a letter ("September Letter") to Healy which contended that Zurich had incorrectly applied the deductible under the Policy. (*See* affidavit of Healy, paragraph 17, and exhibit H to the affidavit).

27. The September letter referenced the application of the deductible to the Landmark Beach Resort claim. (*See* affidavit of Healy, paragraph 17, and exhibit H to the affidavit).

28. The argument that Watson made in the September Letter is the same argument which Shoreline has asserted in the present action, which is that the windstorm deductible should be applied against the total of the covered and uncovered damages. (*See* complaint and exhibit H to the Healy affidavit).

29. Zurich's application of the Policy's windstorm deductible to the Landmark Beach Resort claim used the same methodology as was used by Zurich on all the other properties damaged by Hurricane Opal which were insured under the Policy. (*See* affidavit of Healy, paragraph 18).

30. Watson of Advantage acted as the public adjuster on all the RDI claims under the Policy and was aware of the methodology used by Zurich for applying the windstorm deductible on all these claims. (*See* affidavit of Healy, paragraph 18).

31. RDI was aware of the methodology used by Zurich for applying the windstorm deductible to all the claims filed by RDI under the Policy and knew about this methodology when the various payments were made on these claims. (*See* affidavit of Healy).

32. RDI signed an Advise of Representation for Advantage on 8/4/99 regarding the incorrect application of the windstorm deductible. (*See* exhibit H to the Healy affidavit).

33. On or before 8/4/99, RDI was aware of the allegation that Zurich had misapplied the windstorm deductible when adjusting losses caused by Hurricane Opal.

34. The present action was commenced on September 27, 2001. (*See* the court file).

35. Shoreline has never returned or attempted to return the $86,000 payment which Shoreline received in exchange for the Release.

36. Shoreline has never attempted to rescind the Release.

## II. CONCLUSIONS OF LAW

1. Under the management agreement which existed between Shoreline and

RDI, RDI had the authority to adjust the Hurricane Opal claim, settle the Hurricane Opal claim, receive payment for the Hurricane Opal claim and give releases. An agent acting pursuant to actual or apparent authority can bind a principal. "[I]f a principal permits an agent to assume certain authority in his transactions with the public or with a certain person, and accepts its benefits knowing the facts, that person may act and rely upon such apparent authority and contract with him so as to bind the principal within the limits of that apparent authority." *Alabama Mills v. Smith*, 237 Ala. 296, 186 So. 699, 703 (1939).

2. The Release signed by RDI was binding on Shoreline. Pursuant to the management agreement, RDI had actual authority to sign the Release on behalf of Shoreline.

■ 3. The Release is valid and enforceable. All releases and discharges in writing "must have effect according to their terms and the intentions of the parties thereto." Ala.Code § 12–21–109 (1975). "In the absence of fraud, a release supported by a valuable consideration, unambiguous in meaning, will be given effect according to the intention of the parties to be judged from what appears within the four corners of the instrument itself..." *Smith v. State Farm Mut. Ins. Co.*, 494 So.2d 7, 8 (Ala.1986).

■ 4. The Release is clear and unambiguous. Releases are governed by contract law. *Poarch v. Alfa Mut. Ins. Co.*, 799 So.2d 949, 955 (Ala.Civ.App.2000). If a release is unambiguous then it should be enforced. Courts will not rewrite a clear and unambiguous voluntary contract. *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 35 (Ala.1998).

5. The Release releases Zurich from all the claims and causes of actions asserted by Shoreline in this action, to include the claims for breach of contract, bad faith,

fraud, misrepresentation and deceit. The Release states that the release includes "all contractual claims, extra-contractual claims, tort claims, ... and including all claims arising out of the claims adjustment and claims handling process." The terms of the Release include the breach of contract claim and the claims for bad faith, fraud, misrepresentation and deceit. These claims are therefore covered under the Release.

■ 6. To the extent that Shoreline is contending that the Release is invalid because of fraud in the inducement, Shoreline has affirmed the Release because it has never sought to rescind the Release and Shoreline has never returned or attempted to return the consideration ($86,000) it received for the Release. When a party alleges fraud in the inducement of a release, they have two remedies: (1) to rescind the contract and sue for his money back, in which event he must give up possession of the property and restore all benefits he received under it, or (2) affirm the contract and sue for damages for the deceit, when he may retain the property and its benefits. *Day v. Broyles*, 222 Ala. 508, 133 So. 269 (1931). Shoreline has affirmed the Release and is bound by its terms.

■ 7. An accord and satisfaction occurred between Zurich and Shoreline because there was a genuine dispute as to the amount of damages owed under the Policy, and Shoreline agreed to accept payment of $86,000 as a final settlement of all claims. Ala.Code § 7–3–311 (1975). By accepting the $86,000 check, Shoreline agreed to the condition under which payment was made, which was the release of all claims. Under Alabama law, an accord and satisfaction has occurred if there is a dispute as to an amount owed and an agreement is reached on how much will be paid to extinguish all obligations. *Tatum v. Cater*, 270 Ala. 445, 119 So.2d 223, 225

(1960). Consequently, all claims asserted by Shoreline in the present action have been discharged by an accord and satisfaction.

 8. The interpretation of an insurance contract is a matter of law for the court to decide. *B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 2001 WL 499157 (Ala. Civ.App.2001). Whether a clause in an insurance contract is ambiguous or not, is also a question of law for the court. *Auto-Owners Ins. Co. v. American Century Ins. Co.*, 739 So.2d 1078, 1081 (Ala.1999). Under Alabama law, an insurance contract must be interpreted in its entirety. *Liggans R.V. Center v. John Deere Ins. Co.*, 575 So.2d 567, 569 (Ala.1991). One sentence in an insurance policy cannot be construed in isolation, but must be construed with the entire policy. *Turner v. U.S. Fidelity and Guar. Co.*, 440 So.2d 1026, 1028 (Ala.1983).

 9. The language of the windstorm deductible clause, Zurich Policy at 51, is clear and unambiguous. The windstorm deductible states in pertinent part:

> The Windstorm or Hail Deductible, as shown in the Schedule, applies to the loss or damage to Covered Property, caused directly or indirectly by Windstorm or Hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

Here, the "Windstorm or Hail Deductible [$40,000] applies to the loss or damage...caused directly or indirectly by Windstorm or Hail [$420,901.00]..." This result is required by the plain language of the contract. The insurance policy must be interpreted and enforced as written when the language of the policy is clear and unambiguous. *St. Paul Mercury Ins. Co. v. Chilton–Shelby Mental Health Center*, 595 So.2d 1375, 1377 (Ala.1992).

10. Shoreline's contention that the deductible should be applied to the loss caused by both covered and excluded causes of loss is contrary to plain language of the insurance contract and results in a tortured interpretation of the Policy.

11. The statute of limitations for bad faith, fraud, misrepresentation and deceit are all two years.

 12. The cause of action for bad faith accrues upon the event of bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of bad faith refusal. *Chavers v. National Sec. Fire and Casualty Co.*, 456 So.2d 293, 294 (Ala.1984). Shoreline knew or should have known facts which would have lead it to discover the alleged bad faith more than two years prior to the commencement of this action; therefore the bad faith claim is barred by the statute of limitations.

 13. Facts constituting fraud are deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered. *Gonzales v. U–J Chevrolet Co., Inc.* 451 So.2d 244, 247 (Ala.1984). Under the facts of this case, Shoreline discovered facts constituting the alleged fraud either by actual or constructive knowledge more than two years before this action was commenced. Consequently the claims for fraud, misrepresentation and deceit are barred by the statute of limitations.

## III. CONCLUSION

For these reasons, the Defendant's motion for summary judgment is **due to be and is hereby GRANTED**.