874 So.2d 26 (2004)
GENERAL STAR INDEMNITY COMPANY, Appellant,
v.
WEST FLORIDA VILLAGE INN, INC., d/b/a Best Western Village, Inc., Appellee.
No. 2D02-4012.
District Court of Appeal of Florida, Second District.
April 30, 2004.
*28 Janet L. Brown of Boehm, Brown, Fischer & Harwood, P.A., Maitland, for Appellant.
Matthew R. Danahy of Douglas L. Grose, P.A., Tampa, for Appellee.
WALLACE, Judge.
This appeal raises two questions concerning the proper interpretation of provisions for deductibles in a policy of casualty insurance. First, if a policy provision concerning the amount of the applicable deductible is ambiguous, may reference be made to the unambiguous provisions of the insured's application for insurance and other policy provisions to determine the amount of the deductible? Second, for the purpose of determining the extent of the insurer's obligation to pay the insured for loss to covered property under the policy of insurance, is the amount of the deductible to be applied to noncovered loss as well as covered loss under the policy? We answer the first question in the affirmative, answer the second question in the negative, and reverse the final judgment in favor of the insured that ruled to the contrary.

The Facts
West Florida Village Inn, Inc., doing business as Best Western Village Inn (West Florida), renewed a commercial property insurance policy issued by General Star Indemnity Co. (General Star) to insure the five-building motel complex West Florida operated in Pensacola, Florida. Subject to the terms and conditions of the policy, West Florida paid an annual premium of $21,000 in return for an agreement by General Star to indemnify West Florida for damage caused by covered causes of loss to an aggregate limit of $4,185,600.
On or about September 28, 1998, Hurricane Georges struck the Florida Panhandle with high winds and heavy rain, damaging West Florida's motel. West Florida consulted a public adjuster to determine its loss and subsequently submitted a claim to General Star to recover $476,522.07 under the policy. General Star rejected West Florida's claim, and the dispute was referred to arbitration as provided by the policy. The dispute primarily concerned the policy's scope of coverage. In its claim, West Florida attributed the cause of loss to "Hurricane George [sic]." Although the policy provided payment for direct physical loss to the property, General Star rejected the claim on the ground that the loss was caused by "wind-driven rain," which General Star asserted was an excluded cause of loss under the policy. The arbitration panel issued an appraisal award determining the amount of loss payable under the policyless West Florida's portion of arbitration expensesto be $154,710.25. From the appraisal award figure, General Star withheld $83,712 based on its interpretation of a policy provision calling for a deductible in that amount applicable to loss caused by windstorm and hail. General Star issued payment of $70,998.25 to satisfy West Florida's claim arising from Hurricane Georges.
West Florida filed suit against General Star for breach of the insurance contract. The complaint asserted that $5,000 was the deductible applicable to windstorm loss, not $83,712. The windstorm deductible provision appeared on a document titled "Multiple Deductible Form," which was referenced on the declarations page and *29 included in the policy. West Florida contended that the Multiple Deductible Form was ambiguous and must be construed in favor of the insured.
West Florida's complaint also asserted that regardless of the amount of the deductible, General Star incorrectly applied the deductible to the amount of loss. According to West Florida, because of ambiguity in the deductible provision of the Building and Personal Property Coverage Form, General Star should not have applied the deductible to the amount of loss covered under the policy, which was the appraisal award of $154,710.25. Instead, the deductible should have been applied to the total loss caused by Hurricane Georges, including the covered loss and noncovered loss. West Florida alleged the total loss to be $476,522.07 based upon its public adjuster's prior determination of the total loss. Applying the deductible to the total loss, West Florida would have been entitled to the full amount of the covered loss, $154,710.25, because the difference between the total loss and the covered loss exceeded the amount of the deductible regardless of whether the amount of the deductible was $83,712 or $5,000. Contending that the policy terms were ambiguous and must be construed in its favor, West Florida sued to recover $83,712 that it claimed to be due under the policy.
Following procedural maneuvering not relevant here, the parties submitted the matter to voluntary trial resolution in Hillsborough County pursuant to section 44.104, Florida Statutes (2001). Following a bench trial, the trial resolution judge found "patent ambiguity" in both the Multiple Deductible Form and in the deductible provision of the Building and Personal Property Coverage Form. Construing these provisions in favor of the insured, the trial resolution judge determined the amount of the deductible to be $5,000 and further found that this amount was absorbed by West Florida's total loss in excess of its covered loss. The trial resolution judge determined that the amount of loss not covered by the policy exceeded $90,000; thus a deductible of either $5,000 or $83,712 applied to the total loss resulted in General Star's liability for the full amount of the covered loss, $154,710.25. The trial resolution judge's final decision awarded West Florida $83,712 as the balance due under the policy. The circuit court entered final judgment enforcing the trial resolution judge's decision.

The Law
Our review calls for interpretation of the Multiple Deductible Form[1] and the deductible provision of the Building and Personal Property Coverage Form.[2] The standard of review is de novo. See Biltmore Constr. Co. v. Owners Ins. Co., 842 So.2d 947, 949 (Fla. 2d DCA), review dismissed, 846 So.2d 1148 (Fla.2003); Auto-Owners Ins. Co. v. Marvin Dev. Co., 805 So.2d 888, 891 (Fla. 2d DCA 2001). The facts determined in the voluntary trial resolution proceeding are not subject to appeal. See § 44.104(11).
General principles of Florida insurance law guide our resolution of this appeal. Like other contracts, contracts of insurance should receive a construction that is reasonable, practical, sensible, and just. Weldon v. All Am. Life Ins. Co., 605 So.2d 911, 915 (Fla. 2d DCA 1992). Terms used in a policy should be read in light of the skill and experience of ordinary people. Lindheimer v. St. Paul Fire & Marine *30 Ins. Co., 643 So.2d 636, 638 (Fla. 3d DCA 1994). Insurance policies will not be construed to reach an absurd result. Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135, 1140 (Fla. 1998).
We are mindful that policy provisions excluding or limiting the insurer's liability are construed more strictly than coverage provisions. Purrelli v. State Farm Fire & Cas. Co., 698 So.2d 618, 620 (Fla. 2d DCA 1997). Such limiting provisions must be construed in favor of the insured if they are ambiguous or reasonably susceptible to more than one meaning. Deni, 711 So.2d at 1138. However, the rule of liberal construction in favor of the insured applies only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction. Id. In construing an insurance policy, courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect. Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000). Indeed, a single policy provision should not be considered in isolation, but rather, the contract shall be construed according to the entirety of its terms as set forth in the policy and as amplified by the policy application, endorsements, or riders. Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 166 (Fla.2003) (citing § 627.419(1), Fla. Stat. (2002)); The Praetorians v. Fisher, 89 So.2d 329, 333 (Fla. 1956). The lack of a definition of an operative term does not, by itself, create ambiguity. State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla. 1998); Great Am. Ins. Cos. v. Souza, 855 So.2d 187 (Fla. 4th DCA 2003). Further, ambiguity does not exist merely because an insurance contract is complex and requires analysis to interpret it. Swire Pac. Holdings, 845 So.2d at 165; Koenigsberg v. Intercontinental Ins. Co., 571 So.2d 578, 579 (Fla. 4th DCA 1990) (construing a deductible provision); Am. Motorists Ins. Co. v. Farrey's Wholesale Hardware Co., 507 So.2d 642, 645 (Fla. 3d DCA 1987); Travelers Ins. Co. v. C.J. Gayfer's & Co., 366 So.2d 1199, 1201 (Fla. 1st DCA 1979). Where no ambiguity exists, the policy shall be construed according to the plain language of the policy as bargained for by the parties. Anderson, 756 So.2d at 33.

The Multiple Deductible Form
The Multiple Deductible Form lists two covered causes of loss, "Special" and "Windstorm and Hail,"[3] and two deductible amounts, $5,000 and $83,712. West Florida contends that the spatial arrangement of the phrase "All Covered Causes of Loss except as listed below" in relation to the other items created confusion, suggesting that $5,000 was the deductible applicable to loss caused by windstorm and, presumably, $83,712 was the deductible applicable to all other causes of loss except windstorm.
Standing alone, the Multiple Deductible Form is not a model of clarity. However, the form's ambiguity is readily resolved when read together with other parts of the contract. First, a quick reference to the policy application resolves any doubt that the $83,712 deductible applies to "Windstorm and Hail" damage. See Mathews v. Ranger Ins. Co., 281 So.2d 345, 348 (Fla. 1973) ("The application thus becomes a *31 part of the agreement between the parties and the policy together with the application form the contract of insurance."); Zenith Ins. Co. v. Commercial Forming Corp., 850 So.2d 568, 570 (Fla. 2d DCA 2003). The renewal application, signed by West Florida's president and nearly identical to the original application for the previous policy year, bears the phrase "2% wind deductible" once and the phrase "2% wind ded" four times in describing the various coverages for the individual motel buildings. The property was insured to a limit of $4,185,600 of its value. Two percent of $4,185,600 is exactly $83,712. Thus, when the Multiple Deductible Form and the application are read together, it becomes clear that the "2% wind deductible" and the "Windstorm and Hail" deductible both refer to the same amount$83,712. By contrast, $5,000 is far less than two percent of the insured value of the property and cannot reasonably be confused with the higher amount.
This conclusion is further made plain because the Multiple Deductible Form clearly links "$5,000" to "Special" covered causes of loss, not loss arising from wind damage. In the policy, the Causes of LossSpecial Form[4] defines a "Special" covered cause of loss: "When Special is shown in Declarations, Covered Causes of Loss means RISK OF DIRECT PHYSICAL LOSS." The form then lists numerous exclusions to and limitations on the direct physical loss that is otherwise covered. Thus "Special" covered causes of loss encompass a broad category of all causes of direct physical loss subject to certain exclusions and limitations. The declarations page reveals that all five of the motel buildings are insured for "Special" covered causes of loss. Therefore, the insured is informed that if a building suffers direct physical loss, coverage will be provided if the damage was caused by a covered cause of loss, and this coverage will be subject to the deductible for "Special" covered causes of loss. The Multiple Deductible Form clearly identifies $5,000 as the amount of the deductible for "Special" covered causes of loss. The higher deductible for wind damage appears as an exception to the "Special" deductible for all other causes of loss. Thus, when the application and other parts of the policy are read together with the Multiple Deductible Form, the contract for insurance is clear that the deductible for windstorm damage is $83,712. An insurance policy, though it may be complex, is not ambiguous merely because it requires analysis to interpret it. See Koenigsberg, 571 So.2d at 579.
We note that this is not a case in which the terms of the application conflict with the provisions of the policy. See Padgett v. Horace-Mann Ins. Co., 704 So.2d 627, 629-30 (Fla. 1st DCA 1997) (citing the general rule that where terms conflict, the terms of the policy prevail over the terms of the application except if reliance on the terms of the application would result in greater indemnity). Rather, all of the terms of the contract of insurance, including those of the application, convey one meaning when read together. See Mathews, 281 So.2d at 349. Although the phrase "All Covered Causes of Loss except as listed below" in the Multiple Deductible Form may not have been as artfully drafted and placed as it could have been, the mere fact that a policy provision could have been worded differently does not create an ambiguity when the policy in its entirety is clear. See Swire Pac. Holdings, 845 So.2d at 166.

The Deductible Provision
The deductible provision at issue in this appeal appears in the policy within *32 the Building and Personal Property Coverage Form, which provides, in pertinent part:
D. DEDUCTIBLE
We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.
The form continues with two examples of the deductible provision in operation.[5] West Florida contends that there is an ambiguity in this passage because it refers only to the "amount of loss" and not the "amount of covered loss." In other words, the deductible is to be applied to the total amount of covered and noncovered loss. In this case, the covered loss caused by Hurricane Georges was determined by the arbitrators to be $154,710.25. The trial resolution judge determined that additional noncovered loss caused by Hurricane Georges exceeded $90,000. Thus the total of covered and noncovered loss was at least $244,710.25, which represented the "amount of loss" to which the deductible was to be applied. According to West Florida, even if the deductible were $83,712, West Florida would still receive the full coverage amount of $154,710.25 after the deductible is applied to the total "amount of loss" of at least $244,710.25. West Florida contends that because the word "loss" is nowhere defined in the policy *33 as limited to covered loss, the phrase "amount of loss" in the deductible provision is reasonably susceptible to a construction in which the deductible should be applied to noncovered loss, notwithstanding other policy provisions, such as the Building and Personal Property Coverage Form's "loss payment" provision that expressly refers to "covered loss or damage."
Contrary to West Florida's contention, the lack of a definition for "amount of loss or damage" does not in and of itself create ambiguity, nor should a single provision be read in isolation. Throughout the policy, "loss" is discussed in the context of coverage; nowhere does the policy suggest that General Star would indemnify West Florida for loss that was not covered by the policy. The initial coverage provision of the Building and Personal Property Coverage Form provides that General Star "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Another provision titled "Covered Causes of Loss" references and incorporates the Causes of Loss-Special Form, which provides general coverage for direct causes of physical loss subject to certain exclusions and limitations, as described above. Directly preceding the deductible provision is a section titled "Limits of Insurance," which indicates that the most General Star would pay for "loss or damage" is the amount of coverage available as shown in the declarations. Following the deductible provision is the "loss payment" provision that contemplates payment for "covered loss or damage." To construe "amount of loss" as including noncovered loss in this context is contrary to a common sense reading of the policy.[6]
The notion that a deductible could be applied to loss that is not covered by the policy is fundamentally unreasonable. One need not look for a policy definition of "amount of loss" when the plain meaning of the word "deductible" provides ample guidance. A "deductible" is "a clause in an insurance policy that relieves the insurer of responsibility for an initial specified loss of the kind insured against." Merriam-Webster's Collegiate Dictionary 471 (deluxe ed.1998). A deductible loses its meaning entirely if it is to apply to loss that is not covered by the policy.
"Generally, the functional purpose of a deductible, which is frequently referred to as self-insurance, is to alter the point at which an insurance company's obligation to pay will ripen." Int'l Bankers Ins. Co. v. Arnone, 552 So.2d 908, 911 (Fla.1989). As self-insurance, a deductible requires the insured to share in the risk of loss, and worthy social goals are promoted. *34 The insured is given a monetary incentive to fulfill his or her duty to protect and to adequately maintain his or her property as well as a monetary disincentive to file relatively trivial claims, thereby contributing to the reduction of administrative costs and overall costs of insurance. Conversely, applying the deductible to noncovered loss does not serve the goals of having the insured share in the risk. Indeed, it threatens to render the deductible a nullity.
The practical effect of such a construction of this standard-form deductible provision would indeed produce troubling, if not absurd, results. For example, when processing claims, the insurer would be required to adjust loss that was not covered under the policy. Suppose a homeowner's policycontaining an identical deductible provision as the policy at issue here covered loss from theft of personal property but excluded jewelry. In the event of a loss including furniture, sporting equipment, and jewelry, for example, it would be necessary to obtain an expensive gemological appraisal or otherwise evaluate the noncovered jewelry in order to adjust the loss. The cost of such an appraisal or valuation would have to be borne by either the insurer or the insured, thereby increasing administrative costs unnecessarily. Under the construction urged by West Florida, the amount payable for a given type of loss would depend on factors outside the contemplation of the contract of insurance. This would make it difficult, if not impossible, for insurers to set predictable rates in order to maintain solvency and stability in the insurance industry.
West Florida does not cite any decisional authority in support of its deductibility theory.[7] To the contrary, one court, considering a comparable casualty policy, has addressed the application of the deductible in the manner suggested by West Florida and rejected it outright. In Shoreline Towers Condominium Owners Ass'n v. Zurich American Insurance Co., 196 F.Supp.2d 1210, 1216 (S.D.Ala.2002), the court said of the insured's theory of applying the deductible to loss arising from Hurricane Opal, "[the insured's] contention that the deductible should be applied to the loss caused by both covered and excluded causes of loss is contrary to the plain language of the insurance contract and results in a tortured interpretation of the Policy."[8] Similarly, in West Florida's case, we find that applying the deductible *35 exclusively to the amount of covered loss is consistent with the only reasonable interpretation of the contract of insurance read in its entirety. An interpretation to the contrary would be tortured and would lead to absurd results.
For the reasons set forth in this opinion, we reverse the final judgment awarding $83,712 to West Florida and remand for entry of final judgment in General Star's favor.
Reversed and remanded.
CASANUEVA and SALCINES, JJ., concur.
*36
 APPENDIX
POLICY NUMBER: IAG-348219 COMMERCIAL PROPERTY
THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
 MULTIPLE DEDUCTIBLE FORM
This endorsement modifies insurance provided under the following:
 ALL COVERAGE FORMS
The Deductibles applicable to any one occurrence are shown below:
 Covered Causes Deductible
 of Loss
 Special $5,000.
All Covered Causes of Loss except as listed below
 Windstorm and Hail $33,712.
NOTES
[1] A copy of this form as it appeared in the record is included with this opinion as an appendix.
[2] Insurance Service Office form number CP 00 10 06 95.
[3] We note that section 627.701, Florida Statutes (1997), which places certain restrictions upon deductible provisions specific to hurricane damage subject to enforcement by the Department of Insurance, does not apply to the contract of insurance in this case. General Star is an excess lines carrier based in Connecticut and is not subject to regulation by the Florida Department of Insurance.
[4] Insurance Service Office form number CP 10 30 06 95.
[5] The form continues as follows:

When the occurrence involves loss to more than one item of Covered Property and more than one Limit of Insurance applies, the Deductible will reduce the total amount of loss payable if loss to at least one item is less than the sum of (1) the Limit of Insurance applicable to that item plus (2) the Deductible.
Example No. 1:
(This example assumes there is no coinsurance penalty.)

Deductible: $ 250
Limit of Insurance-Bldg. 1: $60,000
Limit of Insurance-Bldg. 2: $80,000
Loss to Bldg. 1: $60,100
Loss to Bldg. 2: $90,000

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.
The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$60,100
- 250
_______
$59,850 Loss PayableBldg.

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000. Total amount of loss payable: $59,850 + 80,000 = $139,850.
Example No. 2:
(This example, too, assumes there is no coinsurance penalty.)
The Deductible and Limits of Insurance are the same as those in Example No. 1.

Loss to Bldg. 1: $ 70,000 (exceeds Limit of insurance plus Deductible)
Loss to Bldg 2: $ 90,000 (exceeds Limit of insurance plus Deductible)
Loss Payable  Bldg. 1: $ 60,000 (Limit of Insurance)
Loss Payable  Bldg. 2: $ 80,000 (Limit of Insurance)
Total amount of loss payable: $140,000

West Florida cited these examples in support of its argument to the trial resolution judge. However, these examples of the deductible provision in operation illustrate the problem of applying the deductible when the amount of loss caused by an insured cause of loss exceeds the limits of insurance. These examples are not relevant to West Florida's claim because the amount of its insurable lossthat is, the amount of loss determined by the appraiserswas far below the limits of insurance.
[6] West Florida's argument that the coinsurance provision of the policy supports its position is misplaced. The purpose of coinsurance is to increase the risk to the insured when the insured purchases far less coverage than the full value of the property. See generally Couch on Insurance 3d § 220:3-24 (West Group 1999). When a coinsurance provision applies, the insurer does not pay the full amount of loss. Instead, the amount otherwise payable under the policy is reduced in proportion to the extent to which the property is underinsured. Thus the "full amount of loss" in this context necessarily involves a combination of covered loss and loss that is not covered because the insured purchased less coverage than he or she should have. Through coinsurance, the principle of indemnity is upheld by requiring the insured to assume his or her fair share of the risk of loss after the loss occurs. In the policy at hand, after the coinsurance amount is calculated and subtracted from the "full amount of loss," the appropriate deductible is applied to the remaining amount payable under the policy. The coinsurance provision of the policy is not applicable to West Florida's claim, as there is no indication that its property was insured for an amount below the coinsurance percentage as stated in the declarations.
[7] West Florida has provided this court with excerpts from two editions of a standard insurance claims adjusting text. Property Loss Adjusting 2.16-.19, 3.46-.47 (Donna J. Popow ed., 3d ed. Am. Inst. for Chartered Prop. Cas. Underwriters/Ins. Inst. of Am.2003); Property Loss Adjusting 106-12 (James J. Markham ed., 2d ed. Ins. Inst. of Am.1995). These materials describe how a deductible may be "absorbed" by the total amount of loss when the entire loss is caused by a covered cause of loss and recovery is limited only by the limits of insurance. The examples provided by these materials are similar to the examples provided in the deductible provision of the Building and Personal Property Coverage Form. These materials do not support the theory advanced by West Florida because policy limits are not implicated in this case. Rather, a matter resolved by the arbitrators was whether some of the loss claimed by West Florida was caused by an excluded cause of loss, namely, "wind-driven rain." The arbitration award reflects the conclusion that some of the damage caused by Hurricane Georges was not covered by the policy because that damage was attributable to an excluded cause of loss. The materials submitted by West Florida do not support the theory that a deductible should be applied against loss caused by an excluded cause of loss under the policy. Our rejection of West Florida's theory does not bear upon the normal insurance claims adjusting practice of absorbing a deductible when the total amount of loss caused by a covered cause of loss exceeds the limits of insurance for that type of loss.
[8] We are aware that the precise wording of the deductible provision in Shoreline Towers differs from the provision at issue here and that the court's analysis of the policy was dicta in light of its finding that the statute of limitations had run on the insured's causes of action. 196 F.Supp.2d at 1216. Nevertheless, we find the reasoning of the court to be persuasive as it was premised upon a determination that the policy was clear and unambiguous when read in its entirety.