[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13343

Non-Argument Calendar

_____

STAR TITLE PARTNERS OF PALM HARBOR, LLC,
a Florida limited liability company,

Plaintiff-Appellant,

versus

ILLINOIS UNION INSURANCE COMPANY,
an Illinois corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02155-JSM-AAS

_____

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Star Title Partners of Palm Harbor, LLC sought coverage under its Cyber Protection Insurance Policy after it was fraudulently induced—by an unknown actor impersonating a mortgage lender—to wire funds to an incorrect account. Illinois Union Insurance Company denied coverage, asserting that Star Title failed to meet the requirements under the applicable provision in the policy. The district court agreed that coverage did not exist under the plain language of the policy, and granted summary judgment in favor of Illinois Union. After review of the parties' briefs and the record, we affirm.[1]

I

Star Title argues that the fraudulently induced wire transfer qualifies as a covered loss under the Cybercrime Endorsement of its Cyber Protection Policy. We briefly recount the events that led to that wire transfer below, highlight the relevant provision in the policy, and summarize the district court's conclusions.

A

---

[1] We assume the parties' familiarity with the facts and procedural history and set out only what is necessary to explain our decision. As to issues not discussed, we summarily affirm.

Star Title, a settlement agent, was hired to close a residential real estate transaction. For each sale, it typically divides the tasks among two representatives: a processer who is responsible for clearing title for the property, and a closer who is responsible for distributing funds at closing. For the sale in question, Star Title assigned Dee Osborne as the processer and Kathy Wellington as the closer.

The seller of the home identified Capital Mortgage Services of Texas as his lender and lienholder on the property. Ms. Osborne confirmed that CMS did in fact have a lien on the home and requested payoff information. Initially, she contacted CMS at the phone number the seller provided and was able to speak to a representative who told her to submit a request for the information to payoffs@capitalmort.com. Ms. Osborne obliged and sent an email requesting a "Mortgage Loan Payoff Letter." She also provided the name of the sellers/mortgagors, the address of the property, the loan number, the closing date, and attached a copy of the seller's authorization form.

Ms. Osborne then received (what we now know) was a fraudulent email from an unknown actor who claimed to be a CMS payoff representative named "Kaitlyn Holt." Ms. Osborne did not suspect that the email was fraudulent and simply verified that it correctly referenced the information she initially provided via email. The email also contained a copy of the requested Payoff Statement, along with instructions for how to transfer payoff funds. Ms. Osborne verified that the Payoff Statement was

generated by CMS, that it correctly identified the sellers/mortgagors, the loan number, and the property address, and that the payoff amount was consistent with what the seller represented.

In addition to this email, Star Title also received a second copy of the Payoff Statement, via facsimile, purportedly sent by CMS. Ms. Osborne reviewed this faxed copy of the Payoff Statement and verified that it matched the statement provided via email earlier that day. Believing this Payoff Statement to be legitimate, the amount listed in the statement was included in the sellers' debit column of the Final ALTA Settlement Statement presented to the buyers and sellers at closing.

Ms. Osborne was aware that online banking fraud was prominent in the real estate industry. She was therefore on high alert for red flags of possible fraud. But in this case, she did not suspect fraud and believed the Payoff Statement was authentic. If she had "noticed any red flags or suspicious circumstances . . . [she] would have taken additional steps to verify the authenticity of the wire transfer instructions." D.E. 23-1 at 3. Accordingly, she proceeded to initiate Star Title's two-person authentication protocol. She set up the wire transfer so that, upon the approval of the closing representative (Ms. Wellington in this case), the payoff funds from Star Title's escrow account would be transferred to the account provided in the Payoff Statement.

After Ms. Osborne set up the wire transfer, she inputted the information into Star Title's software system. She then emailed Ms. Wellington to notify her that the wire was ready for her

review.  Ms. Wellington was tasked with cross-refencing the hard copy of the wiring instructions, provided by Ms. Osborne, with the information in the software system.  Ms. Wellington was not obligated to reach out to the lender to verify that the wiring instructions were accurate.  In this case, Ms. Wellington found that the wiring information in the hard copy matched the writing information in Star Title's system, and so she released the wire to the (fraudulent) account.

It was later brought to Ms. Osborne's attention by the seller's real estate agent that CMS had not received the payoff funds. Ms. Osborne reached out to a representative at CMS, who informed her that the wire information she had received via email and fax was incorrect.  Star Title then conducted an internal investigation to identify if "there [was] something [it] could've done differently or could've done better." D.E. 19-1 at 12 (deposition of Star Title COO Shera Hunter).  It concluded that there was not but conceded that at the time of the wire transfer, Star Title did not have policy in place to call the lender directly to verify the wire transfer information.  *See id.*

## B

Star Title submitted a claim to Illinois Union under its Cybercrime Endorsement of its insurance policy.  The Endorsement includes a Deceptive Transfer Fraud insuring clause that provides the following:

> We will pay for Your loss of Funds resulting directly from Your having transferred, paid or delivered any Funds from Your Account as the direct result of an intentional misleading of Your employee, through a misrepresentation of a material fact ("Deceptive Transfer") which is:
>
> 1.  relied upon by an employee, and
>
> 2.  sent via a telephone call, email, text, instant message, social media related communication, or any other electronic instruction, including a phishing, spearphishing, social engineering, pretexting, diversion, or other confidence scheme, and,
>
> 3.  sent by a person purporting to be an employee, customer, client or vendor; and,
>
> 4.  the authenticity of such transfer request is verified in accordance with Your internal procedures.

D.E. 19-7 at 32 (bold emphasis in original omitted). To secure coverage under this provision, Star Title must show that its loss resulting from the intentional misleading of Ms. Osborne, was (1) relied upon by Ms. Osborne; (2) sent via one of the delineated methods of communication; (3) by a person purporting to be an employee, customer, client or vendor; and (4) the authenticity of the wire

transfer instructions was verified according to Star Title's internal procedures.[2]

Illinois Union denied coverage because (1) CMS was not an employee, customer, client or vendor of Star Title, and (2) Star Title failed to verify the transfer request according to its procedures. *See* D.E. 1-1 at 51.

## C

Star Title filed suit in state court against Illinois Union for breach of contract, and Illinois Union removed the matter to federal court. Star Title filed a motion for partial summary judgment asserting coverage under the Deceptive Transfer Fraud provision of the Cybercrime Endorsement of its policy. Illinois Union responded with a cross-motion for summary judgment.

The district court denied Star Title's Motion for partial summary judgment and granted Illinois Union's cross motion for summary judgment. It explained that CMS was not an employee, customer, client or vendor of Star Title under the plain meaning of those terms. *See* D.E. 27 at 9–10. It also concluded that Star Title made "no attempt to verify the authenticity of CMS's alleged wire

---

[2] The Policy also excludes coverage for "any loss resulting from . . . any person purporting to be a representative of any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity." D.E. 19-7 at 32 (listing exclusions under the Cybercrime Endorsement). Because we conclude that Star Title does not meet the requirements for coverage under the Endorsement, we do not reach nor opine on this exclusion applies.

8                    Opinion of the Court                    21-13343

transfer instructions pursuant to [its] internal procedures." *Id.* at 10.

Star Title timely appealed.

## II

We review a district court's grant of a motion for summary judgment *de novo. See Rojas v. Fla.*, 285 F.3d 1339, 1341 (11th Cir. 2002). In so doing, we view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 1341–42.

Under Florida law, the insured party generally bears the burden of proving a covered loss. *See LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997). The Florida Supreme Court has held that an insurance policy provision should be construed according to its plain meaning. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,* 913 So. 2d 528, 532 (Fla. 2005). *See also Gen. Star Indem. Co. v. W. Fla. Village Inn, Inc.*, 874 So. 2d 26, 29 (Fla. Dist. Ct. App. 2004) ("Like other contracts, contracts of insurance should receive a construction that is reasonable, practical, sensible, and just.").

"If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the another limiting coverage, the insurance policy is considered ambiguous." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Ambiguous policy provisions are construed in favor of coverage and against the insurer. *See Flores v. Allstate Ins. Co.*, 819

So. 2d 740, 744 (Fla. 2002).  But "[t]he mere fact that an insurance contract is complex and requires some analysis to interpret it does not, by itself, render the agreement ambiguous." *State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. Dist. Ct. App. 2009).  Absent ambiguity, we construe provisions "in accordance with the plain language of the policies as bargained for by the parties." *Anderson*, 756 So. 2d at 34.  If terms in the policy are undefined, they should be given their plain and ordinary meaning.  *See Botee v. S. Fid. Ins. Co.*, 162 So. 3d 183, 186 (Fla. Dist. Ct. App. 2015).  We may look to legal and non-legal dictionaries to ascertain those meanings.  *See id.*

### III

Given the facts of this case, the requirements under the Deceptive Transfer Fraud clause, and the plain meaning of the terms "employee," "customer," "client" and "vendor," we agree with the district court that Star Title has failed to show that it is entitled to coverage under its insurance policy.[3]

As a reminder, the Deceptive Transfer Fraud clause requires that the misleading communication—in this case the email and fax—be "sent by a person purporting to be an employee, customer,

---

[3] The district court, as noted, also ruled that Star Title had failed to show that it had verified the authenticity of the wire transfer in accordance with its internal procedures.  Because failure to meet any one of the requirements listed in the Deceptive Transfer Fraud clause is sufficient to defeat a claim for coverage, we do not opine on whether Star Title did in fact fail authenticate the wire information according to its procedures.

client or vendor." D.E. 19-7 at 32. The policy does not define those terms, so we interpret them according to their plain meaning, using legal and non-legal dictionaries as references. *See Botee,* 162 So. 3d at 186.

Black's Law Dictionary defines the relevant terms as follows:

- Employee: Someone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.

- Customer: A buyer or purchaser of goods or services; esp[ecially] the frequent or occasional patron of a business establishment.

- Client: A person or entity that employs a professional for advice or help in that professional's line of work [.]

- Vendor: A seller, usu[ally] of real property.

BLACK'S LAW DICTIONARY 662, 485, 320, 1869 (11th ed. 2019). The Shorter Oxford English Dictionary defines the terms similarly:

- Employee: A person who works for an employer

- Customer: A person who makes a purchase or gives business, esp[ecially] habitually to any particular seller or establishment.

- Client: A person using the services of any professional; a customer.

- Vendor: A person who sells something, esp[cially] the seller in the sale of property or land.

1 SHORTER OXFORD ENGLISH DICTIONARY 817, 584, 426 (5th ed. 2002); 2 SHORTER OXFORD ENGLISH DICTIONARY at 3515.

Here, the fraudster who sent the email and subsequent fax identified himself/herself as "Kaitlyn Holt," a representative of CMS. But CMS is a mortgage lender, not an employee, customer, client, or vendor of Star Title. Star Title does not employ CMS for any purpose or control CMS' work performance in any manner. Nor does Star Title sell CMS any particular product or provide it any particular service. Star Title argues that in holding the payoff funds in its escrow account and delivering those funds to CMS on behalf of the seller, Star Title is providing a service to CMS. *See* Appellant's Br. at 20. In the same vein, in receiving the payoff funds and applying them to the seller's account, CMS provided a service to Star Title. *See id.* But we are unconvinced by this creative reframing of the relationship between CMS and Star Title. As CMS' Chief Executive Officer explained, CMS provides "services to *consumers* related to all elements of a mortgage transaction, including the funding of loans[.]" D.E. 19-3 at 2 (emphasis added). In this case, CMS' consumer (i.e., customer or client) was the seller of the residential home who had obtained the loan, not Star Title. Similarly, Star Title's client (and customer)—by explicit contract—was

also the seller of the residential home. The reality is that CMS did not have any sort of contract or agreement with Star Title. *See id.* at 4. CMS only owed an obligation to the seller, with whom it had a lien on the subject property. Star Title was tasked *by the seller* to function as a settlement agent. Among its responsibilities was identifying any liens and executing payoff funds if necessary. Star Title did just that (though it wired the payoff funds to the wrong account) on *behalf of the seller*. We therefore cannot construe CMS to be a customer, client, or vendor of Star Title.

Star Title argues that Florida law requires coverage clauses to be construed as broadly as possible to provide the greatest amount of coverage. *See* Appellant's Br. at 18. With that assumption as a backdrop, it contends that the Deceptive Transfer Fraud clause should be "understood" to include "persons and entities involved in the real estate transaction." *Id.* at 18–19. As attractive as that proposition may be, it is simply not what the clause provides. It limits coverage to misleading communications "sent by a person purporting to be an *employee, customer, client or vendor*." D.E. 19-7 at 32 (emphasis added). If we read the provision as broadly as Star Title would like us to, we would essentially omit specific terms included in the contract or expand them beyond recognition. We are prohibited under Florida law from altering the terms bargained to by parties to a contract. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 942 (Fla. 1979) (a court may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties").

21-13343          Opinion of the Court                    13

Although we understand that cybercrime is on the rise, and that it makes sense to provide (and obtain) coverage for situations like this one, the relevant provision does not provide coverage for this fraudulent transfer.

## IV

Star Title has failed to establish coverage under the terms of its insurance policy.  Accordingly, we affirm the district court's grant of summary judgment in favor of Illinois Union.

**AFFIRMED.**