**THYSSENKRUPP STEEL USA, LLC, Plaintiff,**

v.

**UNITED FORMING, INC., Defendant.**

No. CA 12–00297–C.

United States District Court, S.D. Alabama, Southern Division.

Jan. 29, 2013.

Charles William Daniels, Jr., Taylor Noelle Barr, Burr & Forman LLP, Mobile, AL, for Plaintiff.

Bart Gary, Neil Wilcove, Atlanta, GA, J. Hodge Alves, III, Joseph Craig Campbell, W. Alexander Moseley, Hand Arendall LLC, Mobile, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER [1]

WILLIAM E. CASSADY, United States Magistrate Judge.

Plaintiff ThyssenKrupp Steel USA, LLC ("TKS")'s motion for summary judgment in its favor on Defendant United Forming, Inc. ("UFI")'s five-count counterclaim (Doc. 47; *see also* Docs. 48–50, 52, 70 (UFI's opposition), and 80 (TKS's reply in support))[2] and UFI's motion for summary judgment in its favor on Count I of its counterclaim (Doc. 71; *see also* Docs. 72 and 87 (TKS's opposition)) came before the Court on January 3, 2013 for hearing (*see* Doc. 92). After considering the record, the parties' pleadings, and the arguments presented, in the pleadings and at the hearing, and for the reasons set forth herein, TKS's motion for summary judgment is **GRANTED IN PART and DENIED IN PART,** as set out below, and UFI's motion for summary judgment is **DENIED.**

### Background

Briefly, this dispute concerns work performed by UFI for TKS at two TKS facilities located in Calvert, Alabama—the Hot Strip Mill ("HSM") and the Cold Roll Mill ("CRM"). While TKS has filed a complaint against UFI, alleging counts for declaratory judgment, breach of contract, negligence, and misrepresentation (*see generally* Doc. 62, first amended complaint), the summary judgment motions now before the Court deal solely with UFI's five-count counterclaim (Doc. 65).

***The HSM Project.*** TKS, under its former name, "ThyssenKrupp Steel and Stainless USA, LLC," and UFI entered into a written construction agreement under which "UFI agreed to supply services, labor, equipment, materials, things, and items of expense necessary to perform the reinforced concrete work [for the HSM] Building and Equipment Foundations[.]" (*Id.* at 11.)[3] After the parties executed

---

1. This matter is before the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(c), to conduct any and all proceedings, including trial, entry of final judgment, and all post-judgment proceedings. (*See* Docs. 30, written consent of the parties; 34, order of reference.)

2. Because the Court has not considered the three exhibits attached to TKS's reply brief, which UFI has moved to strike (Doc. 83), nor would any consideration of these exhibits alter the Court's conclusions in this order (*cf.* Doc. 85, TKS's response to the motion to strike, suggesting "the Court may disregard the disputed exhibits"), UFI's motion to strike is **DENIED as MOOT.**

3. Unless otherwise indicated, the facts as stated in this section of the memorandum opinion and order are as stated by UFI and not objected to by TKS. At summary judgment, obvious-

the HSM agreement, they agreed upon fifty-three change orders to it. (*Id.*) UFI characterizes two of these, Nos. 7 and 53, as significant (*id.*), something TKS denies (Doc. 69 at 1). The parties agree, however, that UFI substantially completed its work on the HSM Project. (*Id.*)

Four of UFI's five counterclaims deal with the HSM agreement: Count I is a claim for the contract balance on that agreement (*see* Doc. 65, ¶¶ 7–10); Count II seeks additional damages under that agreement based on either breach of contract or *quantum meruit* (*see id.,* ¶¶ 11–14); Count III is a claim for crane supervision (*see id.,* ¶¶ 15–18); and Count v. is for unjust enrichment (*see id.,* ¶¶ 22–25).

**The CRM Project.** TKS and UFI also entered into a written agreement for UFI to provide reinforced concrete work for the CRM facility. (*Id.,* ¶ 5.) While the parties agree that TKS has paid UFI in full for the CRM project's agreed contract value (*compare id., with* Doc. 69, ¶ 5), UFI contends that TKS still owes it "additional compensation for two (2) proposed change orders, and for prejudgment interest on UFI's contract billings" (Doc. 65, ¶ 5).

UFI's fourth counterclaim deals with delay damages on the CRM project. (*See id.,* ¶¶ 19–21.)[4]

*Summary Judgment Standard*

It is well-established that, consistent with Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

---

ly, "[t]he Court will not weigh the evidence or make findings of fact"; its "role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party." *MSC Mediterranean Shipping Co. SA, Geneva v. Metal Worldwide, Inc.,* 884 F.Supp.2d 1269, 1273 (S.D.Fla. 2012) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Morrison v. Amway Corp.,* 323 F.3d 920, 924 (11th Cir.2003)). Accordingly, the facts as stated herein could change should this matter proceed to trial. *Cf. Cassady v. Walker,* No. CV 109–128, 2012 WL 899913, at *12 n. 12 (S.D.Ga. Feb. 6, 2012) ("Of course, the Court's finding ... is limited to the present summary judgment stage of these proceedings, in which the facts are viewed in the light most favorable to Plaintiff. This finding should not be construed as any ruling or commentary on whether Plaintiff will ultimately prevail on his [] claims."), *report & recommendation adopted,* 2012 WL 899200 (S.D.Ga. Mar. 15, 2012).

4. Count V, for unjust enrichment, also applies to the CRM project. (*Compare* Doc. 65, Counterclaim, ¶ 22 ("UFI realleges and incorporates paragraph 1 through 21 of this counterclaim as if fully set forth herein."), *with id.,* ¶ 25 ("UFI is entitled to recover from plaintiff the reasonable value of the services rendered....").)

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c).

*Archie v. Home–Towne Suites, LLC*, 749 F.Supp.2d 1308, 1312 (M.D.Ala.2010) (some internal citations modified).

## Discussion

### I. TKS's motion for summary judgment.

#### a. Illegality

TKS contends that UFI's use of Liberty Reinforcing Steel, Inc. ("Liberty") and Reliable Staffing, Inc. ("Reliable"), two entities not licensed by the Alabama Licensing Board for General Contractors (the "Licensing Board"), to complete its work on the HSM project is an absolute bar to UFI recovering on the four counts of its counterclaim (Counts I, II, III, and V) that concern the HSM agreement between TK and UFI. Or, as UFI states in its opposition to TKS's motion, "TKS asserts the HSM Contract valued at over $100 Million is void in its entirety because UFI entered into contracts with two (2) subcontractors who were not licensed by the [Licensing Board]." (Doc. 70 at 8.) While UFI contends that the work performed by Liberty and Reliable represent a miniscule amount of UFI's contract balance claim (*see id.* at 8–9),[5] TKS counters that "[t]here are no exceptions under Alabama law for those like UFI who use[ ] an unlicensed subcontractor to only perform part of the work" (Doc. 80 at 3).

The Alabama General Contractor's Practice Act (the "AGCPA"), ALA. CODE § 34–8–1 *et seq.*, "is . . . regulatory legislation designed to protect the public against incompetent contractors and to assure properly built structures that are free from defects and dangers to the public." *Ipsco Steel (Alabama) Inc. v. Kvaerner U.S. Inc.*, No. Civ.A.01–0730–CG–C, 2005 WL 1244929, at *4 (S.D.Ala. May 25, 2005) (quoting *Thomas Learning Cent., Inc. v. McGuirk*, 766 So.2d 161, 169 (Ala.Civ.App. 1998) and citing *White v. Miller*, 718 So.2d 88, 89–90 (Ala.Civ.App.1998); *Architectural Graphics & Constr. Servs., Inc. v. Pitman*, 417 So.2d 574, 576 (Ala.1982); *Coo-*

---

**5.** UFI provides the declaration of Steve Dollar, a UFI Project Manager on the HSM Project, in which Mr. Dollar states that he has "compared the value of the work by UFI's forces and those of its subcontractors to the total HSM Contract Sum," which totals more than $109 Million. (Doc. 72–2, ¶ 32.) According to Dollar, "UFI self-performed most of the work," and its "total for materials, labor, and other services it provided is [almost $94 Million], or nearly 86 percent of the adjusted Contract sum[,]" while the total value of Liberty's work was less than $3.5 Million or 3.12 percent (of which UFI only owes Liberty less than $325,000), and Reliable's total amount was just over $639,0000 or 0.58 percent (which UFI has paid in full). (*Id.*)

*per v. Johnston,* 283 Ala. 565, 219 So.2d 392 (1969)). Under the AGCPA,

> one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more, shall be deemed and held to have engaged in the business of general contracting in the State of Alabama.

*Id.,* § 34–8–1(a). Similarly,

> a "subcontractor" is defined to be one who constructs, superintends, or engages in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving, or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more under contract to general contractor as defined in subsection (a) or another subcontractor.

*Id.,* § 34–8–1(c).

And in *B.D. Stephenson Trucking, L.L.C. v. Riverbrooke Capital Partners, L.L.C.,* Civil Action No. 06–0343–WS–M, 2006 WL 2772673 (S.D.Ala. Sept. 25, 2006),[6] this Court observed,

> [a]s a matter of Alabama statute, "[a]ny person, firm, or corporation not being duly authorized who shall engage in the business of general contracting in this state ... shall be deemed guilty of a Class A misdemeanor." ALA.CODE § 34–8–6(a).

Alabama courts have taken this principle one step further, declaring that "express or implied contracts with unlicensed 'general contractors' [are] unenforceable as a violation of public policy. Such contracts are illegal and unenforceable by the unlicensed 'general contractor.'" *Med Plus Properties v. Colcock Constr. Group, Inc.,* 628 So.2d 370, 374 (Ala.1993) (citations omitted); *see also Architectural Graphics,* 417 So.2d at 576 ("a contract by an unlicensed 'general contractor,' as defined in § 34–8–1, is null and void as a violation of that public policy. Such contracts are illegal and unenforceable by the unlicensed general contractor."). Moreover, "an unlicensed contractor will not be afforded the privileges that come from the statute because of its association with a licensed contractor ...; because of its obtaining a license subsequent to the execution of the contract ...; or because of the equally inequitable conduct of the other contracting party." *Med Plus,* 628 So.2d at 374–75 (citations omitted); *see also Thomas Learning Center,* 766 So.2d at 170 (opining that unlicensed contractor may not argue reliance on another person in determining licensure requirements in Alabama). Alabama courts make no apologies for the sometimes draconian consequences of this inflexible rule, but instead explain that this licensing statute is a "penal one, and harsh results sometimes flow from the construction of a penal statute." *Archi-*

---

6. There, the plaintiff, Stephenson, sought compensation for the repudiation of a contract between it and Riverbrooke under which Stephenson was to perform water and sewer infrastructure work. Riverbrooke moved for summary judgment on its defense "that the contract was rendered void and unenforcea-ble by Stephenson's failure to obtain an Alabama general contractor's license, and that plaintiff's tort claims fail because a contractor cannot circumvent Alabama's licensure requirement by recasting his barred contract claims as tort claims resting on facts pertaining to the breach of contract." *Id.* at *2.

*tectural Graphics,* 417 So.2d at 577 (quoting *Hawkins v. League,* 398 So.2d 232, 237 (Ala.1981)).

*Id.* at *3 (some citations modified); *see also id.* at *3 n. 5 (explaining that Alabama's rule that contracts are unenforceable by an unlicensed "general contractor" expresses "the more general notion that 'if the purpose of a licensing statute is the regulation of the business licensed and not merely the collection of revenue, a person not licensed cannot enforce a contract for services rendered within the scope of the regulated business'" and that "Alabama law is quite clear that '§ 34–8–1 et seq., Ala.Code 1975, is not a law enacted solely for revenue purposes, but rather is regulatory legislation designed to protect the public against incompetent contractors and to assure properly built structures which are free from defects and dangers to the public'") (quoting, respectively, *Tucker v. Walker,* 293 Ala. 589, 308 So.2d 245, 247 (1975); *Architectural Graphics,* 417 So.2d at 576).[7]

 While this Court, in *Ipsco Steel* and *Stephenson,* dealt with whether certain entities fell within the confines of the AGC-PA, TKS's illegality argument presents a different question, which appears to be one of first impression: whether, under Alabama law, work performed by an unlicensed subcontractor that is but part of the overall work performed by a general contractor nullifies the entirety of the general contractor's work for an owner. Put differently, pursuant to Ala.Code § 34–8–1 *et seq.,* and cases interpreting it, does the

unenforceability of an illegal contract made with an unlicensed subcontractor taint the entirety of a general contractor's agreement with an owner, making the general contractor's agreement with the owner illegal and also unenforceable? TKS argues that it does.

And, certainly, Alabama law clearly holds that *a party cannot recover for work performed in violation of the AGC-PA.* *See generally Cooper v. Johnston,* 219 So.2d 392 (unlicensed general contractor "was not entitled to recover for his services incident to [a] contract [that was] contrary to public policy"); *Architectural Graphics,* 417 So.2d 574 (contractors unlicensed status barred his suit on a note)[8]; *Goodwin v. Morris,* 428 So.2d 78 (Ala.Civ. App.1983) (admittedly unlicensed general contractor could not recover on his illegal contract; court would not consider his joint venture with a licensed general contractor argument on appeal); *Brown v. Mountain Lakes Resort, Inc.,* 521 So.2d 24 (Ala.1988) (affirming trial court's decision that because underlying contract between owner and unlicensed general contractor was unenforceable, "there was no unpaid balance that could be recovered by Brown's Ready Mix[,]" which provided materials to the general contractor and was a lienholder on the property); *J & M Indus., Inc. v. Huguley Oil Co., Inc.,* 546 So.2d 367 (Ala.1989) (affirming summary judgment on the defendant-owner's defense that the plaintiff-sub-subcontractor not licensed in Alabama and, thus, could not enforce a lien on the property); *White*

---

**7.** In *Stephenson,* summary judgment was denied because the Court could not "foreclose the possibility that Stephenson was a subcontractor . . . for § 34–8–1 purposes" and, thus, possibly possessed the ability "to enforce the contract even though it was not licensed, provided that it never actually began work on the project." *Id.* at *4 (citing ALA.CODE § 34–8–7(c)(5) (under which subcontractors need not

be licensed when a project is bid, but must be licensed before they begin work)).

**8.** "If a suit to enforce the contract is foreclosed to an unlicensed contractor, so must be a suit by the same unlicensed contractor to collect on a note secured by a mortgage given in consideration of that contract." *Id.* at 576.

*v. Miller,* 718 So.2d 88 (unlicensed general contractor could not recover on his admittedly illegal contract by recasting his contract claim as one for fraud and deceit); *B.D. Stephenson Trucking,* 2006 WL 2772673 (if Stephenson is determined to be a contractor (and not a subcontractor), as defined by the AGCPA, it is not entitled to recover on its contract with Riverbrooke because Stephenson was not licensed by the Licensing Board).[9]

But a very recent decision by the Alabama Supreme Court, *White–Spunner Construction, Inc. v. Construction Completion Co., LLC,* 103 So.3d 781 (Ala.2012), TKS contends, is "nearly identical" to "UFI's illegal use of unlicensed subcontractors" in this case (Doc. 48 at 8), and demonstrates why UFI's use of Liberty and Reliance prevents it from recovering on claims which merely include work performed by those subcontractors.

At issue in *White–Spunner,* pertinent to this case, was a contract between a subcontractor, CCC (which held a general contractor's license), and a "sub-subcontractor," Buena Vista (which was not licensed). *See id.* at 782–83 ("CCC subcontracted with Buena Vista ... for Buena Vista to provide CCC with the workers CCC needed to fulfill its agreement with White–Spunner[,]" the general contractor).[10] At the trial level, as to CCC's claims against White–Spunner and its

surety, Hartford Fire Insurance Company, Mobile County Circuit Judge Rick Stout granted summary judgment in favor of CCC, *see id.* at 785–86, and in doing so, held that the contract between CCC and Buena Vista was not illegal because "Buena Vista was not required to be licensed to perform the service it was contracted to perform[,]" that of a labor broker, *id.* at 788.

On appeal, White–Spunner argued that (1) there was no labor broker exception to the AGCPA and (2) there was a genuine issue of material fact as to whether Buena Vista acted as a mere labor broker based on its level of involvement. And, relying on a decision of the Supreme Court of West Virginia, *Personnel Temporary Services v. West Virginia Division of Labor Contractor Licensing Board,* 197 W.Va. 149, 475 S.E.2d 149 (1996), the Alabama Supreme Court agreed, finding no labor broker exception existed in the AGCPA, and, therefore, "Buena Vista was engaged in general contracting and violated Alabama law by failing to obtain the necessary license. Accordingly, CCC's agreement with Buena Vista was illegal." *Id.* at 794. The Court then relied on its decision in *Hinkle v. Railway Express Agency,* 242 Ala. 374, 6 So.2d 417 (1942),[11] discussed in more detail below, to reverse the summary judgment entered for CCC:

---

**9.** All cases in this string have been cited to the Court by TKS.

**10.** "White–Spunner, a licensed general contractor, signed two contracts worth approximately $99 million to construct eight four-story dormitory buildings at Auburn University[.] ... After construction on the Auburn project began, White–Spunner subcontracted with CCC, which also held a general contractor's license, to provide labor, materials, and services in connection with the framing of the buildings being constructed. Under the terms of their agreement, CCC agreed to provide workers for the project and White–Spunner

agreed to pay CCC a set fee for each man-hour worked pursuant to [a set] schedule[.]" *Id.*

**11.** In *White–Spunner* the Court explained, "this Court has held that '[a] person cannot maintain a cause of action if, in order to establish it, he must rely *in whole or in part* on an illegal or immoral act or transaction to which he is a party.'" *Id.* (quoting *Ex parte W.D.J.,* 785 So.2d 390, 393 (Ala.2000) (citing, in turn, *Hinkle,* 6 So.2d at 421)) (emphasis added).

CCC's claims against White–Spunner and Hartford [were] dependent upon its contract with Buena Vista because [CCC] cannot establish a right to the money it claims without proving that it performed the work required; however, that same evidence establishing that the work was performed—sign-in sheets, invoices, etc.—also establishes that the work was performed by Buena Vista workers pursuant to the illegal contract between CCC and Buena Vista. The courts will not be used to assist "those who transgress the moral or criminal code," and the summary judgment entered in favor of CCC must accordingly be reversed.

*Id.* (quoting *Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.,* 621 So.2d 953, 955 (Ala.1993)); *see also id.* at 795 ("CCC's claims against White–Spunner and Hartford stem from an illegal contract CCC entered into with Buena Vista, an unlicensed contractor, that provided that Buena Vista employees would complete the work CCC contracted to perform.").

As noted above, while Alabama law has long recognized that contracts, whether express or implied, with general contractors not licensed with the Licensing Board are unenforceable as against public policy, *see, e.g., Stephenson,* 2006 WL 2772673, at *3 (collecting authority), TKS admitted at the hearing on January 3, 2013 that, to its knowledge, *White–Spunner* is the first decision to also cite to *Hinkle* in a decision applying this prohibition, and the Court's independent research confirms this. The principle in *Hinkle,* although announced in 1942, is certainly alive and well some seventy years later. In fact, in addition to *White–Spunner,* last August, in affirming summary judgment for the defendants, the Alabama Supreme Court again held that "the judicial system may not be used to enforce illegal contracts." *Limestone Creek Developers, LLC v. Trapp,* 107 So.3d 189, 193 (Ala.2012) (citing *Ex parte W.D.J.,* 785 So.2d at 393; *Hinkle,* 6 So.2d at 421; *Oden,* 621 So.2d at 955). And *Hinkle* is significant to TKS's illegality argument because TKS has latched on to *Hinkle's* pronouncement that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole *or in part* on an illegal or immoral act or transaction to which he is a party," 6 So.2d at 421 (emphasis added), to counter UFI's defense that Liberty and, to the extent it was required to be licensed, Reliance performed a very small amount of the work on the HSM Project.

There are three problems with TKS's illegality argument, all of which prevent this Court from granting summary judgment, on this ground, in TKS's favor on the entirety of Counts I, II, and III of UFI's counterclaim.[12]

*First, White–Spunner* does not reach as far as TKS hopes because the Supreme Court's opinion makes it clear that *but for its illegal contract with an unlicensed subcontractor* CCC would not have had a claim against White–Spunner and Hartford. *See* 103 So.3d at 794 ("CCC's *claims* against White–Spunner and Hartford *are dependent upon* its contract with Buena Vista[,]" which was not licensed by the Licensing Board; therefore, CCC could not assert a claim against White–Spunner and Hartford because the same evidence establishing that CCC performed the work for White–Spunner "also establishes that the work was performed by Buena Vista workers pursuant to the illegal contract between CCC and Buena Vista"); 103 So.3d at 795 ("CCC's *claims* against White–Spunner and Hartford *stem from* an illegal contract CCC entered into with

---

12. Count V, for unjust enrichment, is ad- dressed separately below.

Buena Vista, an unlicensed contractor, that provided that Buena Vista employees would complete the work CCC contracted to perform.") (emphases added).[13]

Thus, consistent with the authority cited *supra* at 1292–93, *White–Spunner* stands for the unassailable proposition that a party cannot recover for work performed in violation of the AGCPA (there, the work performed by the unlicensed sub-subcontractor, Buena Vista, was the entire basis for CCC's claims against White–Spunner and Hartford).

*Second,* because it is obvious that not all of the work performed by UFI was dependent upon or stemmed from work performed by an entity that should have been, but was not, licensed by the Licensing Board, TKS relies on *Hinkle*'s "in whole or in part" language, included in the *White–Spunner* decision, to attempt to reach the entirety of UFI's work on the HSM Project. However, based on the holding in *White–Spunner,* as explained above, "in part" is merely dicta (because "the whole" of CCC's claims were dependent upon/stemmed from its illegal contract with Buena Vista). But, *to the extent TKS asserts that Hinkle itself, notwithstanding White–Spunner, bars UFI from recovering on the four counts of its counterclaim dealing with the HSM agreement,* it is important to flesh-out how *Hinkle* and similar cases should apply to this case. To that end, although the Supreme Court in *White–Spunner* relies on its previous decision in *Oden, see* 103 So.3d at

793–94 (citing *Oden,* 621 So.2d at 955), neither TKS nor UFI discuss the import of *Oden,* which, obviously, has not been overruled, on "the *Hinkle* Rule."

As explained by the Supreme Court in *Lemond Construction Co. v. Wheeler,* 669 So.2d 855 (Ala.1995),

> [m]ore recently, in *Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.,* 621 So.2d 953 (Ala.1993), this Court clarified the meaning of the [ ] statement from *Hinkle* [—that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party."] In *Oden,* this Court held: "We interpret the rule in *Hinkle* to bar any action seeking damages based on injuries that were a direct result of the injured party's knowing and intentional participation in *a crime involving moral turpitude.*" 621 So.2d at 955 (emphasis added). A crime involving moral turpitude is one involving conduct with an inherent quality of baseness, vileness, or depravity in regard to the duties one owes to society. *Meriwether v. Crown Investment Corp.,* 289 Ala. 504, 268 So.2d 780 (1972); 58 C.J.S. MORAL (1948).

*Id.* at 861 (some citations modified); *see also Dapremont v. Overcash, Walker & Co., P.C.,* No. Civ.A. 99–0353–BH–M, 2000 WL 1566532, at *7 (S.D.Ala. Oct. 4, 2000) (Hand, J.) (relying on *Oden* and *Lemond* to recognize the same limitation).

---

**13.** This holding is consistent with other Alabama Supreme Court cases relied on by TKS. *See Cooper,* 219 So.2d at 396 ("[A] party to an illegal contract cannot recover from the other party money received by him **under and by virtue of** the contract, by an action on the contract, or on the common counts, or for a conversion."); *Bankers & Shippers Ins. Co. of N.Y. v. Blackwell,* 255 Ala. 360, 51 So.2d 498, 502 (1951) (noting that although the plaintiff's contract of insurance was not prohibited by law, it could not recover because its *"only* insurable interest [was] **dependent upon** an illegal transaction"); *Limestone Creek Developers,* 107 So.3d at 194 (affirming summary judgment where the "breach of contract claim, as well as LCD's other claims, ... were **dependent on** [an illegal] contract") (emphases added).

In *Lemond,* the Supreme Court affirmed the trial court's decision to deny the plaintiff's motion for a directed verdict based upon its argument, grounded in *Hinkle,* that a death was caused by the decedent's "participation in an illegal activity"—"Because Lemond presented no substantial evidence that Chris's actions as a passenger in the automobile driven by Jason involved base, vile, or depraved conduct, we conclude that the trial court correctly denied Lemond's motion for a directed verdict based on this issue." *Id.* Here, similarly, TKS has made no argument regarding whether, and presented no evidence to show that, UFI's use of Liberty and Reliable involved base, vile, or depraved conduct. Relatedly, although Liberty "not being duly authorized [and still] engag[ing] in the business of general contracting in this state [would make it] guilty of a Class A misdemeanor," ALA.CODE § 34–8–6(a), TKS has not shown that UFI's association with an alleged misdemeanant equates to UFI knowingly and intentionally participating in a crime involving moral turpitude, especially to the extent TKS requests that this Court nullify an over $100 million contract on summary judgment. *Cf. Glenn Constr. Co., LLC v. Bell Aerospace Servs., Inc.,* 785 F.Supp.2d 1258, 1292 n. 27 (M.D.Ala.2011) ("[A]lthough it is undisputed that Glenn Construction[, the general contractor,] employed unlicensed subcontractors, the Court finds that this does not render the Contract with Bell Aero[, the owner,] void or unenforceable.") (citation omitted).

■ *Third,* as "a federal court sitting in diversity[,]" this Court "should, whenever possible, 'reach the same result as the state court would reach in deciding the identical issue.'" *Goodwin v. George Fischer Foundry Sys., Inc.,* 769 F.2d 708, 711 (11th Cir.1985) (quoting *Trimper v. Nationwide Ins. Co.,* 540 F.Supp. 1188 (D.S.C.1982)). Thus, here, the Court is "required ... to function as an Alabama court in deciding the issue[s] presented in this case[,]" including whether the use of an unlicensed subcontractor by one party to a contract nullifies that contract—in its entirety—because the contract is against public policy. *Id.; see also, e.g., Ortega v. IBP Inc.,* Civ. A. No. 92–2351–KHV, 1993 WL 463526, at *2 (D.Kan. Sept. 27, 1993) (denying plaintiffs' motions for summary judgment and observing, "In this diversity case, we ascertain and apply Kansas Law such that we reach the same result that a Kansas court would reach.") (citation omitted).

In *Goodwin,* the Eleventh Circuit, in addressing whether a contract should not be enforced because of public policy, observed that "Alabama courts have stated, '[t]he true test to determine whether a contract is unenforceable because of public policy is whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public.'" *Id.* at 713 (quoting *Colston v. Gulf States Paper Corp.,* 291 Ala. 423, 282 So.2d 251, 255 (1973); citing *Lowery v. Zorn,* 243 Ala. 285, 9 So.2d 872 (1942)) (internal quotation marks omitted).[14] But this principle "should be applied cautiously and only in cases plainly within the reason for it. [Further, i]t is repeated often in the cases that there must be a dominating public

---

**14.** Relatedly,

[i]t is generally recognized that the public policy of a state is to be found in its Constitution and statutes and judicial decisions. In order to ascertain the public policy of a state in respect to any matter, the acts of the legislative department should primarily be looked to, because a legislative act, if constitutional, declares in terms the policy of the state.

*Denson v. Alabama Fuel & Iron Co.,* 198 Ala. 383, 73 So. 525, 529 (1916).

interest." *Id.* (citing, respectively, *Lowery*, 9 So.2d at 874; *Ex parte Rice*, 258 Ala. 132, 61 So.2d 7 (1952)). And, as recently restated by the Court of Civil Appeals,

> courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare....

*Alfa Specialty Ins. Co. v. Jennings,* 906 So.2d 195, 199 (Ala.Civ.App.2005) (quoting *Milton Constr. Co. v. State Highway Dep't,* 568 So.2d 784, 788 (Ala.1990), *overruled in part on other grounds by Ex parte Alabama Dep't of Transp.,* 978 So.2d 17, 23 (Ala.2007)) (quoting in turn 17 AM. JUR. 2d CONTRACTS § 178 (1964)) (emphases omitted).[15]

Applying these principles, this Court, functioning as an Alabama court, cannot say that the HSM agreement *between UFI and TKS* is unenforceable because of UFI's separate—unenforceable—agreement with an unlicensed subcontractor. While it is "clear and certain" that contracts with unlicensed contractors are unenforceable in Alabama because such contracts contravene public policy, it is far from "clear and certain" that some work performed by an unlicensed subcontractor for a licensed general contractor taints the general contractor's entire agreement with an owner, nullifying that agreement as against public policy and, thus, allowing an owner "to escape from [its] obligations on the pretext of public policy[.]" *Milton Constr.,* 568 So.2d at 788. Thus, TKS is not entitled to judgment as a matter of law on any illegality theory that conflates the *Hinkle* Rule and the AGCPA's prohibition against enforcing contracts with unlicensed contractors (such as the agreement between Liberty and UFI) to invalidate the entire HSM agreement, between UFI and TKS, extending the holding of *White–Spunner,* because such an amalgamated approach disregards this Court's duty to merely ascertain and apply Alabama law to reach the same result an Alabama court would reach.

■ TKS, however, has proven, its entitlement to a limited grant of summary judgment pursuant to an illegality theory consistent with the discussion herein. TKS is **GRANTED** summary judgment on Counts I, II, and III of UFI's counterclaim to the extent amounts claimed by UFI under those counts "are dependent upon" or "stem from" work performed for UFI by Liberty[16]—which UFI admits was unlicensed, in violation of the AGCPA (Doc. 70 at 8 ("UFI agrees that Liberty Reinforcing Steel, Inc. [ ] was not licensed with the state of Alabama at the time it performed work on the HSM Project."); *cf. id.* at 15

---

**15.** This "cautionary approach" was recently reiterated in *Perdue v. Green,* —— So.3d ——, 2012 WL 887492 (Ala. Mar. 16, 2012), *see id.* at ——, at *8, immediately following the Supreme Court's citation to *Carrington v. Caller,* 2 Stew. 175, 192 (Ala.1829) (every contract "adverse to the enactments of the legislature[ ] is illegal and void"), a seemingly black and white pronouncement TKS relies on in its reply (*see* Doc. 80 at 4).

**16.** UFI has provided evidence as to the total value of Liberty's work on the HSM Project (approximately 3.12 percent of the HSM Contract Sum), but the Court will take up the issue of how best to determine, consistent with applicable law, the value of Liberty's work for UFI on the HSM Project at the Phase II scheduling conference.

("The rebar work on the [HSM] project was roughly equally divided between Liberty and National Erectors Rebar, Inc., which is a licensed contractor.") (citing Doc. 72–2, Dollar Decl., ¶ 33)).[17]

As to Reliable, the Court finds that there is a genuine issue of material fact as to whether Reliable was required to be licensed under the AGCPA. *Compare, e.g., White–Spunner,* 103 So.3d at 790 (unlicensed subcontractor Buena Vista's employees were "used [ ] to frame buildings[,]" work that "is specifically recognized as a construction activity by the Licensing Board for General Contractors[,]" citing ALA. ADMIN. CODE r. 230–X–1–.27,[18] and concluding that "in connection with the Auburn project, that Buena Vista "under[took] to construct or superintend or engage in the construction ... of [a] building ... in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more[,]'" citing § 34–8–1(a)), with Doc. 72–14, Decl. of John Dufour, UFI's Senior Project Superintendent on the HSM Project, ¶¶ 6–8 (providing, in part, that "the riggers hired by UFI from Reliable principally assisted the crane operators in removing loads of reinforcing steel, or rebar, from delivery trucks to the location within the HSM building for the reinforcing steel workers to place into the forms. The riggers also assisted in moving UFI's forming equipment used by UFI's carpenters from one location to another. These riggers, however, did not perform any work or services on the project which became a permanent part of the completed structure.").

### b. Waiver and Release

■ TKS next contends that through the execution of lien waivers UFI waived and released two counts of its counterclaim: Count II (its claim for additional damages under the HSM agreement based upon breach of contract or, alternatively, *quantum meruit* ) and Count IV (seeking delay damages on the CRM project). (*See generally* Doc. 48 at 16–20.)

■ "Releases are governed by contract law." *Shoreline Towers Condominium Owners Ass'n, Inc. v. Zurich Am. Ins. Co.,* 196 F.Supp.2d 1210, 1215 (S.D.Ala.2002) (citing *Poarch v. Alfa Mut. Ins. Co.,* 799 So.2d 949, 955 (Ala.Civ.App.2000)); *see also Edwards v. Kia Motors of Am., Inc.,* 554 F.3d 943, 946 n. 7 (11th Cir.2009) ("[U]nder Alabama law a release is a contract ....") (citation and internal quotation marks omitted). And, as this Court has observed, "[w]hen the terms of a re-

---

17. "In order to demonstrate entitlement to a judgment as a matter of law on a no licensure defense, a party must prove (with respect to an alleged general contractor): (1) that the alleged contractor was unlicensed; (2) that the contracted work was of the type covered by the licensure statute; and (3) that the 'cost' of the work was [$50,000] or more." *Central Ala. Home Health Servs., Inc. v. Eubank,* 790 So.2d 258, 260 (Ala.Civ.App.2000). First, because Liberty worked on the HSM project without a license, the fact that it is a subcontractor, not a general contractor, does not impact this analysis. *See Stephenson,* 2006 WL 2772673, at *3–4. Next, it is clear that the work performed by Liberty for UFI, *e.g.,* to "install all reinforced steel and accessories" (Doc. 50–5, UFI–Liberty Subcontract Agreement, at 1 (attached to TKS's motion for summary judgment and relied upon in UFI's opposition)) represents "the type covered by the licensure statute," *see* ALA.CODE §§ 34–8–1(a), (c). And, finally, it is uncontested that the cost of the work Liberty performed for UFI far exceeded $50,000. (*See* Doc. 72–2, ¶ 32.)

18. A copy of Regulation 230–X–1–.27, titled "Major Classification" is provided as an exhibit to TKS's summary judgment motion (Doc. 50–8). "Framing" is listed under "Carpentry" as a "special skill[ ]" or trade[ ] or craft [that] may be requested in lieu of the major classification of Building Construction. (*See id.* at 4.)

lease are unambiguous, Alabama courts discern the parties' intentions solely by examining the document; they will not consider extrinsic evidence:

> It is a well settled statement of law that 'in the absence of fraud, a release supported by a valuable consideration, unambiguous in meaning, will be given effect according to the intention of the parties to be judged by the court from what appears within the four corners of the instrument itself, and parol evidence is not admissible to impeach or vary its terms.'
>
> . . .
>
> 'The construction of a written document is a function of the court. If the document is unambiguous, its construction and legal effect are a question of law which may be decided under appropriate circumstances, by summary judgment.'"

*Schultz v. Southeast Supply Header, LLC,* 661 F.Supp.2d 1260, 1265 (S.D.Ala.2009) (quoting *Boggan v. Waste Away Group, Inc.,* 585 So.2d 1357, 1359–60 (Ala.1991)) (other citations omitted).[19]

Five lien waivers are at issue here (Docs. 52–1, 52–2, 52–3, 52–4, and 52–6).[20] All five contain the following language:

> [T]here are no additional costs or claims for any extras or additions for labor or material with respect to the above-described contract and project to [the

specified date] except as may be stated on the pay request submitted with this waiver. . . .

> . . .
>
> In consideration of the interim payment, [UFI] does hereby release [TKS] from all claims of any kind arising under or by virtue of said contract and work done and / or materials and / or equipment supplied by [UFI] for the above-described project to [the specified date.]

(Docs. 52–1 at 4, 6; 52–2 at 4; 52–3 at 4; 52–4 at 4; 52–6 at 5.)

As to the first excerpt, UFI contends that, except for Count III of its counterclaim, "the claims [it has] raised . . . have nothing to do with extras or additions for labor or materials. Most of [its] claims . . . deal with delays suffered by UFI at the hands of TKS[,] which TKS knew [of] by the October 2009 payment application. . . . [Further,] UFI [contends that it] had no way of quantifying those delays as it continued to perform work on the Project." (Doc. 70 at 20 (citation omitted).) As to the second excerpt, UFI contends that its claims "do not arise under the contract, and have nothing to do with work performed or materials supplied." (*Id.*) It also contends that its claims "were not contemplated at the time the parties entered in to the contracts." (*Id.* (further stating, "The delay claims which have been

---

19. At issue in *Schultz* was a release

 reliev[ing] Defendant from liability for "all claims and damages of every kind whatsoever, present and future . . . arising from or related to . . . surveying, prepara[ing], laying and constructi[ng . . .] a pipeline and appurtenances under, upon, and across the land described in the Grant of Easement . . .," as well as "any and all other damages resulting from the construction of [SESH's] proposed pipeline and its appurtenances. . . ."

 *Id.* at 1266. There, Judge DuBose determined that the release plaintiffs signed "un-

ambiguously include[d] the claims that form[ed] the substance of [the] dispute" and, accordingly, refused to consider parol testimony regarding the plaintiff's "intentions in entering into the Release[,]" ultimately finding that the plaintiff's claims were barred by the Release. *Id.*

20. The first four waivers concern the HSM agreement—No. 14B (Doc. 52–1); No. 14A-R1 (Doc. 52–2); No. 13A–R2 (Doc. 52–3); and No. 13B (Doc. 52–4). The fifth waiver concerns the CRM agreement—No. 9 (Doc. 52–6).

reserved by UFI are not even mentioned in the lien waivers, and thus could not have been waived by UFI.").)

### 1. Ambiguity.

Taking the second except first, the Court finds that the release language is unambiguous. The release language is undeniably broad—"all claims of any kind *arising under **or by virtue of*** said contract." And while UFI contends that its delay claims "do not arise under the contract," it fails to address whether the delay claims "arise . . . ***by virtue of*** " the contract.

But in *United States v. William Cramp & Sons Ship & Engine Building Co.*, 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907), the United States Supreme Court, in a case concerning damages for delay caused by the government and on appeal from the Court of Claims, examined similar language—a release of "all claims of any kind or description under or by virtue of [a] contract"—and held,

> Manifestly, included within this was every claim arising not merely from a change in the specifications, but also growing out of delay caused by the government. The language is not alone 'claims under,' but 'claims by virtue' of the contract,—claims of any kind or description.' All the claims for which allowances were made in the judgment of the court of claims come within one or the other of these clauses. ***It may be that, strictly speaking, they were not claims under the contract, but they were clearly claims by virtue of the contract. Without it no such claims could have arisen.*** Now, it having been provided in advance that the contract should be closed up by the execu-

tion of a release of this kind, it cannot be that the company, when it signed the release, understood that some different kind of release was contemplated. It must have understood that it was the release required by the contract,—a release intended to be of all claims of any kind or description under or by virtue of the contract . . .

*Id.* at 126–27, 27 S.Ct. 676 (emphasis added); *see also J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 1963 WL 8559, at *2–3 (1963) ("The contention that the claim herein involved, being one for damages for breach of contract arising out of unjustified delays caused the contractor, is not one, in the language of the release, 'under or arising out of said contract,' and therefore not covered by the release, **cannot be sustained.** Both the Supreme Court and this court have long held that such claims, where not excepted from the provisions of a release, are as effectively barred as claims for additional work performed under the contract.") (applying *Cramp*) (emphasis added); *John Monaghan, Inc. v. State Highway Dep't*, 81 Ga. App. 289, 58 S.E.2d 242, 244–45 (1950) (applying, *inter alia, Cramp* to affirm trial court's dismissal).

Turning to the first excerpt, the Court finds that "no additional costs *or* claims for any extras or additions for labor or material with respect to the above-described contract and project" (emphasis added) coupled with the broad language of the release—"all claims of any kind arising under or by virtue of said contract"—is broad enough to reach any delay claims that, UFI contends, are not strictly for "extras or additions for labor or materials."[21]

---

**21.** According to paragraph 13, under Count II, of UFI's counterclaim (Doc. 65), "UFI submitted to TKS its request [for] additional compensation in the amount of not less than

$7,000,000, which UFI seeks to recover from TKS." Further, in its response to TKS's summary judgment motion, UFI confirms that a February 25, 2011 Letter is the basis for

A more recent federal decision, interpreting very similar language pursuant to very similar state law, is also instructive. In *G.R. Sponaugle & Sons, Inc. v. Hunt Construction Group, Inc.*, 366 F.Supp.2d 236 (M.D.Pa.2004), the district court, applying Pennsylvania contract law, which is substantially the same as Alabama law, *see id.* at 242–43, stated:

> [T]he release Sponaugle submitted with its payment applications bars the instant action seeking recovery for Sponaugle's extra work allegedly caused by Hunt's delay and interference. In pertinent part, the release provides that Sponaugle "waives, *any and all claims,* rights or causes of action whatsoever *arising out of or in the course of the work performed on [the project]* ... prior to the date" of the particular payment application. This language is broad but the aspect relevant here is that it is plain, clear and unambiguous and waives *any and all claims arising out of work performed on the project* before the date of the particular payment application. This means that Sponaugle certainly waived its right to recover for any extra work when it submitted the January 20, 2003, release.

*Id.* at 243 (emphasis added); *compare id. with* Docs. 52–1 at 4, 6; 52–2 at 4; 52–3 at 4; 52–4 at 4; 52–6 at 5 (*"all claims of any kind arising under or by virtue of said contract* and *work done* and/or materials

and/or equipment supplied by [UFI] *for the above-described project* ") (emphasis added).

■ Next, although UFI asserts that "[t]he conduct of the parties reflects their true intent concerning the lien waivers" and insists that the "Court may consider the conduct and dealing of the parties in construing a contract" (Doc. 70 at 20), a finding that the waiver language is unambiguous precludes any inquiry into the parties' conduct, including their dealings after the making of the contract. UFI directs the Court to *Carroll v. LJC Defense Contracting, Inc.*, 24 So.3d 448, 456 (Ala.Civ. App.2009), in which the court noted that "[a] trial court may consider the parties' dealings after the making of a contract because the dealings 'are important as going to show [the] construction [of the contract] by [the] parties themselves while friendly.' " *Id.* at 456 (quoting *Flagg–Utica Corp. v. City of Florence*, 275 Ala. 475, 156 So.2d 338, 343 (1963)). In *Flagg–Utica*, the Supreme Court first determined, however, that it was dealing with an ambiguous contract before considering the parties' dealings. *See* 156 So.2d at 342–43 ("We now come back to the ambiguous words above quoted from paragraph 6(a). . . . It is a long established principle of law obtaining in this state that if the language of a written agreement is on its face ambiguous, the courts will look at the surrounding circumstances, at the situation

Count II of its counterclaim. (*See* Doc. 70 at 8.) This letter (Doc. 52–5), which has been filed under seal by TKS, describes UFI's damages as "Delay, Disruption, and Impact (DDI) Damages," but also makes clear that UFI based its DDI Damages, at least in part, on additional labor costs. *E.g., id.* at 1 ("The basis of UFI's claim is comprised of two (2) basic components: extended general conditions (time dependent costs) and the costs resulting from hourly labor interruptions. The extended general conditions claim is based upon the additional days spent on the

project as a result of the delays and disruptions. The hourly labor interruption claim is based upon the lost or wasted time which occurred as a result of the many delays and disruptions to UFI's planned course of work."); 2 ("UFI has made an attempt to quantify the effects of the multiple DDI's on this project on the hourly labor force employed by UFI."). As such, it would seem that this evidence, at a minimum, contradicts UFI's contention that its delay damages "have *nothing to do with* extras or additions for *labor* or materials."

of the parties, and the subject matter of the contract for aid in giving a construction to its language. Dealings of parties subsequent to the written contract are important as going to show construction by parties themselves while friendly.") (internal citations omitted); *see also Voyager Life Ins. Co., Inc. v. Whitson,* 703 So.2d 944, 949 (Ala.1997) (***"If one must go beyond the four corners of the agreement in construing an ambiguous agreement,*** the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.") (citing, *inter alia, Flagg–Utica* ) (emphasis added); *Hester v. Miller,* 364 So.2d 1146, 1148 (Ala.1978) ("We think the better rule is to determine the intent of the parties by considering the contract as a whole as well as the surrounding circumstances of the agreement. *Charles H. McCauley Associates, Inc. v. Snook,* 339 So.2d 1011 (Ala.1976)[, also relied on by UFI]. ***This rule is applicable if, upon the face of the instrument, an ambiguity exists.***") (emphasis added); *United States Fid. & Guar. Corp. v. Elba Wood Prods., Inc.,* 337 So.2d 1305, 1308 (Ala.1976) ("Appellant argues that the clause should be interpreted in light of the history of dealings with Elba and Beck. It has been said in this connection that one of the most satisfactory tests for the ascertainment of the true meaning of an insurance contract is to place oneself in the position of the contracting parties and to view all of the facts and circumstances surrounding them in order to determine what they meant by the phrases and words of the instrument. However, the circumstances surrounding the contract are **only** considered **where the terms are ambiguous.**") (citations and internal quotation marks omitted) (emphasis added); *Noell v. American Design, Inc., Profit Sharing Plan,* 764 F.2d 827, 832 (11th Cir.1985) ("If the language [of a contract] is ambiguous or uncertain in any respect, the surrounding circumstances, including the construction placed on the language by the parties are taken into consideration so as to carry out the intention of the parties.") (quoting *City of Montgomery v. Maull,* 344 So.2d 492, 495 (Ala.1977)).

### 2. Consideration.

■ Not only must a release be unambiguous in meaning, it must also be "supported by valuable consideration" before it "will be given effect according to the intention of the parties [based on] what appears within the four corners of the [release.]" *Schultz,* 661 F.Supp.2d at 1265.

As to lack of consideration, UFI contends first that the parties' agreements, to which form lien waivers were annexed,[22] required that consideration for the lien waivers be received within 30 days. Article 11.2(A) ("Progress Payments"), which appears to be the same in both agreements, provides,

> Except to the extent expressly stated otherwise elsewhere in the Contract Documents, the Contract Sum shall be payable upon the completion of payment Milestones listed in Annex D and will be paid ***thirty (30 calendar days*** after approval by [TKS] and CC [defined as the construction coordinator[23]] of a proper

---

**22.** The Schedule of Annexes for the CRM agreement lists ANNEX K ("Specimens of Standby Letters of Credit, Bonds, and Lien Waivers") (Doc. 50–3 at 7); *compare id., with* Doc. 52–6 at 5 (titled "ANNEX K4–Lien Waiver Forms"). The Schedule of Annexes for the HSM agreement (Doc. 1–1 at 10) is the same; *compare id., with, e.g.,* Doc. 52–1 at 4 (also titled "ANNEX K4–Lien Waiver Forms").

**23.** "CC" is defined in the parties' agreement as "the person(s) or entity(ies) designated by

application for payment for such completed payment Milestone. . . .

(Docs. 1–1, HSM agreement, at 45; 50–2, CRM agreement, at 43.) Relying, at least in part on this provision, UFI asserts that three of "[t]he waivers TKS relies upon, HSM Payment Applications Nos. 14A–R1 and 14B (for October 2009) and CRM Payment Application No. 9 (for May 2009), were either not paid, not paid in full, or not paid timely." (Doc. 70 at 18.)

And "TKS concedes that if the Court does not dismiss all causes of action on the HSM [agreement] pursuant to the illegality argument, [which the Court has only accepted in part,] UFI has created a factual dispute as to whether claims that may have arisen for work performed after Sept. 30, 2009 have been waived." (Doc. 80 at 11.) This concession is based on the Declaration of Kevin Swanson (Doc. 72–13), UFI's Chief Financial Officer, in which Mr. Swanson testifies that UFI posted payments received from TKS for two waivers associated with the HSM agreement (Nos. 13A–R2 [Doc. 52–3] and 13B [Doc. 52–4]) for work performed through September 30, 2009, but did not post payments for two other waivers associated with the HSM agreement (Nos. 14A–R1 [Doc. 52–2] and 14B [Doc. 52–1]) for work performed through October 31, 2009. (*See* Docs. 72–13 at 3; 80 at 11.)

But, as to the CRM agreement, which "was [ ] paid in full [by] May 2011" (Doc. 70 at 18), UFI has not explained how Article 11.2(A) of the agreement, which expressly applies to payment of "the Contract Sum . . . upon completion of payment Milestones listed in Annex D [upon submission] of a proper application payment[,]" trumps the unambiguous language in the lien waiver that it becomes effective "[u]pon receipt of the [stated] sum"—especially considering that Article 11.2(A) also states it applies "[e]xcept to the extent expressly state[d] otherwise elsewhere in the Contract Documents[.]" And, based on the parties' briefing and the summary judgment evidence, it appears that neither consideration generally nor untimely consideration is at issue as to the CRM agreement and the September 30, 2009 lien waivers for the HSM agreement. Therefore, having already found the release language in those waivers unambiguous, the Court **GRANTS** TKS summary judgment as to (1) Count II of UFI's counterclaim, concerning *solely* the HSM project, pursuant to lien waivers No. 13A–R2 (Doc. 52–3) and No. 13B (Doc. 52–4), *only* for work performed through September 30, 2009, and (2) Count IV of UFI's counterclaim, concerning the CRM project.[24]

### c. Unjust enrichment.

Count V of UFI's counterclaim is for unjust enrichment, and therein UFI, in part, states, "[it] provided services for, at the request of, and valuable to [TKS. It] expected to be paid for all services, labor, and materials at the time such was delivered to [TKS. TKS] has refused to pay for all such services rendered by UFI and, therefore, has been unjustly enriched." (Doc. 65, Counterclaim, ¶¶ 23–24.) "To prevail on a claim of unjust enrichment

[TKS] in writing to [UFI] as the Construction Coordinator appointed by [TKS] to perform certain construction management services in relation to the Work, and in lack of any appointment it means [TKS]." (Doc. 50–2 at 8.)

**24.** Based on this decision and TKS's concession concerning consideration (as to lien waiver Nos. 14A–R1 and 14B), the Court does not need to discuss TKS's untimely notice arguments at length. Concisely, the Court finds that summary judgment is not proper pursuant to that argument. There is a genuine issue of material fact as to whether the means of providing notice was proper and timely.

under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Vill., LLC v. Welch*, 4 So.3d 1095, 1098 (Ala.2008) (citing *American Family Care, Inc. v. Fox*, 642 So.2d 486, 488 (Ala.Civ. App.1994)).

As to this count, TKS asserts that it is entitled to summary judgment, but its motion, without citing authority, merely provides (1) UFI's unjust enrichment claim "includes the totality of [its] counterclaims under both the HSM and CRM Contracts"; (2) "[t]o the extent Count V is based on the HSM Contract, it is due to be denied based on the illegality of UFI's third party contracts"; and (3) "[t]o the extent Count V is based on the CRM Contract and Count II arising from the HSM Contract, it is due to be denied

based on UFI's waiver and its failure to notify [TKS] of its claim." (Doc. 48 at 8 n. 4 & 9 n. 5.) While "courts may resolve unjust enrichment claims on summary judgment[,]" *Eller Media Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 355 Fed.Appx. 340, 342 (11th Cir.2009) (per curiam) (citing *Nova Info. Sys., Inc. v. Greenwich Ins. Co., NAC*, 365 F.3d 996, 1006–08 (11th Cir.2004)), TKS's perfunctory treatment of Count V does not carry its burden to show that it is entitled to judgment as a matter of law on this count.[25]

## II. UFI's motion for summary judgment.

UFI's motion seeks summary judgment on the amount it contends TKS owes it under the HSM agreement, which, according to UFI's calculation, is almost $12 million. (*See, e.g.*, Doc. 71–1 at 3 ("TKS owes to UFI the sum of $11,746,430.25 as the Contract balance on the HSM project,

**25.** In denying TKS summary judgment on UFI's claim for unjust enrichment, the Court simply finds that TKS has not proven its entitlement to judgment as a matter of law, not that UFI will ultimately be able to use equitable notions to get around unambiguous contractual waivers. *Compare Leverso v. South-Trust Bank*, 18 F.3d 1527, 1534 (11th Cir. 1994) ("[U]nder universal contract principles judicial equitable notions cannot override unambiguous contractual rights. It is well settled that a court cannot rewrite the terms of a contract in an attempt to make otherwise valid contract terms more reasonable for a party or to fix an apparent improvident bargain.") (internal citation and footnote omitted), *with Feinberg v. Leach*, 243 F.2d 64, 67 (5th Cir.1957) (Tuttle, J.) (in affirming the district court's dismissal of second amended complaint, finding plaintiff's complaint "to be no more than a transparent attempt to evade the requirements of the parole evidence rule prohibiting the variation of the unambiguous terms of a written contract by evidence of a contemporaneous oral understanding, even if such an attempt is made under the guise of an equitable action to rescind or reform a written agreement"); *cf. Federated Mut. Ins. Co. v. Abston Petroleum, Inc.*, 967 So.2d 705, 714

(Ala.2007) (in the context of insurance, an insured's reasonable expectation of coverage cannot overcome unambiguous language in an insurance policy; "[o]therwise, this Court would be faced with the strong temptation to substitute its notion of equity for the unambiguous terms of a contract and the doctrine could be used to invalidate every policy exclusion") (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 312 (Ala.1999)) (internal citations omitted); *accord Nautilus Ins. Co. v. Mobile Area Mardi Gras Ass'n, Inc.*, Civil Action No. 10–0025–WS–M, 2010 WL 4269184, at *5 (S.D.Ala. Oct. 27, 2010) (further noting, "Alabama courts do not rewrite clear contracts simply because one party expected something different than the contract provided. Indeed, Alabama courts have consistently expressed profound reluctance to tinker with clear policy language by substituting their own subjective sense of what is fair for the terms of the parties' actual bargain. To embark on such a slippery slope would be to risk wholesale invalidation of bargained-for, agreed-upon policy exclusions in the name of a judge's *post hoc* perceptions of equity. Alabama law does not allow such an activist approach.").

which is obtained by subtracting the aggregate of all HSM payments, $97,949,132, from the total Contract sum, as adjusted by Change Order Nos. 1–53, or $109,695,562.25.") (record citation omitted).) While UFI contends that it is due summary judgment because it can prove the existence of a valid, binding contract, its own performance, TKS's nonperformance, and damages, *see, e.g., Southern Med. Health Sys., Inc. v. Vaughn,* 669 So.2d 98, 99 (Ala.1995), TKS strenuously contests the adequacy of UFI's performance pursuant to the HSM agreement (*see generally* Doc. 87; *see, e.g., id.* at 2 ("UFI did not render full and complete performance under the contract terms nor did it meet its contractual, common law, and legal obligations[.]"). And TKS has, more importantly, gone beyond the pleadings by presenting evidence, particularly the affidavit of TKS's Senior Project Controller, J. Randall Bevis (Doc. 87–1) to designate specific deficiencies in UFI's performance, which is adequate to show that there exists specific issues for trial as to UFI's performance under the contract. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Further, as explained at the hearing, to the extent UFI is using this motion as a means to eliminate certain issues for trial (such as an accounting of the balance due UFI on the HSM agreement if the adequacy of its performance was not in dispute), a ruling on the motion for that purpose is both premature at this stage and better considered as a proposed stipulation should this matter proceed to a bench trial. Accordingly, UFI's motion for summary judgment (Doc. 71) is **DENIED.**

*Conclusion*

As to the motions for summary judgment (Docs. 47 and 71):

1. TKS is **GRANTED** summary judgment as to Counts I and II of UFI's counterclaim to the extent amounts claimed by UFI under those counts are dependent upon or stem from work performed for UFI by Liberty. The value of that work is to be determined during the next phase of this litigation;

2. TKS is **GRANTED** summary judgment as to Count II of UFI's counterclaim for work performed on the HSM project through September 30, 2009, those claims having been released pursuant to lien waivers No. 13A–R2 and No. 13B;

3. TKS is **GRANTED** summary judgment as to Count IV of UFI's counterclaim, that claim having been released pursuant to lien waiver No. 9;

4. TKS's motion is **DENIED** in all other respects; and

5. UFI's motion is **DENIED** in its entirety.

Further, TKS's motion, in the alternative, for a protective order regarding a Rule 45 subpoena *duces tecum* issued from the United States District Court for the Northern District of Georgia by UFI to third party Navigant Consulting, Inc., which was transferred to this Court by Magistrate Judge King's November 29, 2012 Order, (*see* Doc. 89) was also shall taken up at the hearing.[26] Since a ruling on this motion requires the Court to determine the proper scope of discovery in this matter going forward ("Phase II"), the

---

26. Because TKS failed to prepare a privilege log, Judge King denied its Rule 45 motion to quash. And, to the extent TKS is seeking a Rule 26 protective order based on dual assertions of privilege and non-compliance with this Court's Phase I scheduling order (Doc. 39), Judge King transferred the Rule 26 request to this Court, as the court overseeing the underlying litigation.

Court **RESERVES RULING** pending a scheduling conference regarding Phase II.

In that regard, the parties are **ORDERED** to meet and confer and, no later than **February 14, 2013,** file a supplemental Rule 26(f) report setting forth their views regarding the value of Liberty's work on the HSM agreement, as discussed herein, and the following issues pertinent to the resolution of this matter: (1) the impact of this order on TKS's claims against UFI, specifically its declaratory judgment claim; (2) discovery to be completed; (3) issues to be taken up prior a final pretrial conference, including the resolution of this matter through alternative dispute resolution; and (4) a schedule for completion of discovery, further dispositive motions, and trial.

The parties shall appear before the undersigned on **February 21, 2013, at 10:00 a.m.,** in Courtroom 3A, United State Courthouse, Mobile, Alabama to discuss Phase II.